STATE OF NORTH CAROLINA v. DAVID JUNIOR WARD

No. 158A92

(Filed 3 November 1994)

**1. Criminal Law § 244 (NCI4th)— first-degree murder—newspaper article about co-participant's conviction—denial of continuance—no violation of right to fair trial**

A defendant charged with first-degree murder was not denied his Sixth and Fourteenth Amendment right to a fair trial before an impartial jury by the trial court's denial of his motion for a continuance based upon a newspaper article published in the county · the day after the mailing of notice for jury duty which revealed that a co-participant in the murder had been convicted of first-degree murder of the victim and sentenced to life imprisonment where the State meticulously asked members of the venire

whether they recalled reading, seeing, or hearing anything about the two cases; none had read the newspaper article, and only eleven recalled reading, seeing, or hearing anything about the incident when it happened one year earlier; all jurors who were impaneled stated that they had not formed an opinion about this case and would be able to set aside whatever they had read, heard, or seen about the cases and decide this case entirely upon the evidence presented at trial; and defendant did not exhaust his peremptory challenges and does not now contend that any juror impaneled was objectionable to him.

**Am Jur 2d, Continuance § 40.**

**Pretrial publicity in criminal case as affecting defendant's right to fair trial—federal cases. 10 L. Ed. 2d 1243.**

**2. Jury §§ 111, 114 (NCI4th)— capital trial—jury selection—death penalty views—pretrial publicity—sequestration and individual voir dire not required**

The trial court did not err by denying defendant's motion for sequestration and individual voir dire of prospective jurors in a capital trial on the ground that the Eighth and Fourteenth Amendments to the U.S. Constitution required individual voir dire to ensure the sincerity of the responses of potential jurors with respect to their views on capital punishment. Nor did the trial court err by denying the motion on the ground that pretrial publicity about the case was so widespread that sequestration and individual voir dire were necessary in order to allow inquiry into the extent of the familiarity prospective jurors had with the case without exposing the entire panel to the prior knowledge of some individuals.

**Am Jur 2d, Jury § 197.**

**3. Jury § 226 (NCI4th)— capital trial—jury selection—death penalty views—excusal for cause without questioning by defendant**

The trial court did not err by excusing for cause in a capital trial prospective jurors who stated that they would be unable to vote for the death penalty but that they could follow the law as to sentence recommendation without affording defendant the opportunity to question them where all of the jurors unambiguously stated that they could not or would not vote to return a verdict of guilty of first-degree murder knowing that death is one of

the possible penalties, or that they would not be able to vote for the death penalty even though they were satisfied beyond a reasonable doubt that one or more of the aggravating circumstances prescribed by statute existed, the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty, and any mitigating circumstances found to exist were insufficient to outweigh the aggravating circumstances found. Because the jurors were unequivocal about their inability to vote for the death penalty, additional questioning by defendant would not likely have produced different answers.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**4. Jury § 154 (NCI4th)— capital case—jury selection—understanding about consideration of death penalty—questions disallowed—no prejudicial error**

The trial court did not err by refusing on two occasions to permit defense counsel to ask prospective jurors in a capital trial whether they understood that "our law only requires you to consider the death penalty" since the questions and defense counsel's prefatory comments were confusing and did not follow the statute as the trial court recommended to defense counsel. Assuming *arguendo* that the trial court was required under *Morgan v. Illinois*, 504 U.S. ——, 110 L. Ed. 2d 492 (1992) to allow these two questions to determine whether jurors would automatically vote to impose the death penalty upon conviction, any error in excluding these two questions was harmless because defendant was allowed through further voir dire to engage in the line of inquiry that must be allowed under *Morgan*.

**Am Jur 2d, Jury §§ 201, 202.**

**5. Criminal Law § 537 (NCI4th)— murder trial—emotional outburst by victim's husband—denial of mistrial not error**

The trial court did not err by denying defendant's motion for mistrial in a first-degree murder trial after an emotional outburst by the victim's husband during defendant's opening statement where the husband spoke no words but only sobbed and immediately left the courtroom; the incident was over quickly and caused minimal interruption; the court reporter never noted its

occurrence as he transcribed defendant's opening statement; counsel for defendant gave the entire opening statement without pause and only noticed that the jurors looked leftward at some point during his opening statement; and defendant was thus not prejudiced by the husband's emotional outburst. Nor did the trial court err by failing to give a curative instruction with regard to the victim's outburst absent a request by defendant for such an instruction.

**Am Jur 2d, Trial §§ 252 et seq., 1077 et seq.**

**Emotional manifestations by victim or family of victim during criminal trial as ground for reversal, new trial, or mistrial. 31 ALR4th 229.**

6. **Evidence and Witnesses § 184 (NCI4th)— first-degree murder—incarceration of victim's husband on drug charges—irrelevancy to show absence of intent to kill**

Evidence that a murder victim's husband was incarcerated on felony drug charges on the night of the murder was not relevant to show that defendant did not have the specific intent to kill the victim and was properly excluded by the trial court in this first-degree murder trial since (1) this evidence had no logical tendency to show that there were drugs hidden in the victim's house and could not reasonably support an inference that defendant was at the victim's house to steal cocaine and did not plan to kill the only person who could lead him to the cocaine, and (2) such an inference was contradicted by defendant's own statement that a co-participant told him that he had a job to do, namely, to rob and perhaps kill the victim; that he waited, armed with a rifle, with the co-participant in a bush behind the victim's house; and that he started shooting when the victim got out of her truck.

**Am Jur 2d, Evidence §§ 556 et seq.**

7. **Evidence and Witnesses § 175 (NCI4th)— rifle telescope— admissibility to show premeditation and deliberation**

Evidence of a rifle telescope was relevant and admissible in a first-degree murder trial to show that defendant and a co-participant armed themselves to hit a distant target at night in low light and thus that defendant premeditated and deliberated the killing where the evidence at trial showed that the victim had been shot at night from a distance of more than three or four feet by bullets from a .22 caliber rifle and that the shots were fired in

rapid succession; defendant told a deputy sheriff that he fired a .22 caliber rifle at the victim and supplied information as to where the rifle was located; a duffel bag containing, among other things, the .22 caliber rifle used in the shooting and the dismounted telescope was found at the co-participant's residence; "scrape marks" on the mounting bracket of the rifle corresponded to "scrape marks" on the telescope; defendant stated that he and the co-participant waited until night to commit the robbery-murder; and a killing done from a distance in low light is the type of situation that would call for a telescopically equipped weapon.

Am Jur 2d, Evidence §§ 556 et seq.

8. **Evidence and Witnesses § 3090 (NCI4th)— prior inconsistent statement—witness who heard statement second hand—testimony inadmissible**

Testimony by the medical examiner that she heard second hand from a deputy that a neighbor of the victim told the deputy that he heard between three and five gunshots on the night of a murder was inadmissible to prove a prior inconsistent statement by the neighbor who testified that he heard five gunshots and that he did not recall telling anyone that he heard between three and five gunshots.

Am Jur 2d, Witnesses §§ 604 et seq.

Use of prior inconsistent statements for impeachment of testimony of witnesses under Rule 613, Federal Rules of Evidence. 40 ALR Fed 629.

9. **Criminal Law § 423 (NCI4th)— jury argument—defendant's failure to produce forecasted evidence**

The prosecutor's remarks in his jury argument in a capital trial concerning defendant's failure to produce exculpatory evidence forecasted by defense counsel were not improper comments on defendant's failure to testify but constituted fair and proper comments on defendant's failure to present any evidence since (1) defendant was not the only witness who could have produced the forecasted evidence, and defendant argued that the evidence presented by the State, reasonable inferences therefrom, and gaps and deficiencies therein supported defendant's version, and (2) the prosecutor directed the remarks at counsel for defendant and never commented on defendant's failure to testify or suggested that defendant should or could have testified.

STATE v. WARD

[338 N.C. 64 (1994)]

Am Jur 2d, Trial §§ 577 et seq., 605 et seq.

**Violation of federal constitutional rule _(Griffin v. California)_ prohibiting adverse comment by prosecutor or court upon accused's failure to testify, as constituting reversible or harmless error. 24 ALR3d 1093.**

10. **Criminal Law § 447 (NCI4th)— jury argument—facts about victim and victim's family—no gross impropriety**

The prosecutor's argument in a capital trial of facts about the victim and the victim's family did not so grossly overstep the evidence or amount to so grossly improper an appeal to the jury's sympathy for the victim or the victim's family as to require the trial court to recognize and correct it _ex mero motu_. Moreover, evidence supporting defendant's guilt was overwhelming, and therefore any impropriety in the remarks was not prejudicial.

Am Jur 2d, Trial §§ 664 et seq.

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

11. **Criminal Law § 468 (NCI4th)— jury argument—characterizations of defendant's case—no impropriety**

Statements by the prosecutor characterizing defendant's case as "an ingenuity of counsel" and a "fairy tale" were not improper where it is apparent that the prosecutor was commenting on defendant's failure to present forecasted exculpatory evidence rather than unfairly denigrating the defense.

Am Jur 2d, Trial §§ 683 et seq.

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

12. **Evidence and Witnesses § 2241 (NCI4th)— psychiatric testimony—opinion of alcohol or drug abuse—conversations with defendant—admissibility to show basis for opinion**

Where a forensic psychiatrist who conducted a thorough and professional examination of defendant to determine his competency to stand trial for first-degree murder stated his opinion that defendant suffered from possible alcohol or drug addiction, the

STATE v. WARD

[338 N.C. 64 (1994)]

trial court erred by refusing to permit defendant to elicit testimony by the psychiatrist that defendant reported to him that he was a drug abuser and was unable to remember what happened the night of the crime in order to show the basis for the psychiatrist's opinion. However, this error was harmless where substantially the same information was admitted when the psychiatrist testified about defendant's history of substance abuse and stated that he diagnosed cocaine or alcohol addiction based on defendant's history, and where no reasonable juror would have given any weight to defendant's statement that he was unable to remember what happened the night of the crime in light of defendant's confession to law officers the day after the victim was killed.

**Am Jur 2d, Expert and Opinion Evidence §§ 228 et seq.**

**13. Criminal Law § 1360 (NCI4th)— capital trial—impaired capacity mitigating circumstance—insufficient evidence to require submission**

The trial court did not err by refusing to submit the statutory impaired capacity mitigating circumstance to the jury in a first-degree murder sentencing hearing where the evidence tended to show that defendant historically abused drugs; defendant's psychiatric expert could not conclude unconditionally that defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired; and although there was testimony that defendant smoked an indeterminate amount of crack cocaine over the course of, at most, one-half hour more than eight hours before he committed the murder, defendant's sister testified that he was acting "normal" within one and one-half hours of the murder.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**14. Criminal Law § 1363 (NCI4th)— capital trial—nonstatutory mitigating circumstances—impaired capacity to plan— influence of drugs—insufficient evidence to require submission**

The trial court in a first-degree murder sentencing hearing did not err by refusing to submit as possible nonstatutory mitigating circumstances that (1) defendant's capacity to make and carry out plans on the day of the crime was impaired, and (2) the influence of drugs greatly affected defendant's participation in the crime where there was evidence that defendant was seen smok-

ing crack by his sister two days before the killing; he was seen smoking an indeterminate amount of crack in a car with a co-participant eight hours before the killing; later in the evening of the same day, he was observed playing with his sister's children in a normal manner within one and one-half hours of the killing; he did not suffer from psychosis, clinical depression, or any other disorders; he had elevated liver enzymes that were consistent with either acute hepatitis or drug abuse, but physicians never ruled out hepatitis; defendant had an I.Q. of eighty-five, slightly below normal; he was a slow learner in school, or learning disabled, but not even mildly retarded; and defendant's own psychiatric expert opined that defendant had the capacity to make and carry out plans on the day of the killing. Nothing in the evidence would permit the jury to speculate as to the effect of drugs on defendant's participation in the killing.

**Am Jur 2d, Criminal Law §§ 598, 599.**

15. **Criminal Law § 1357 (NCI4th)— capital trial—mental or emotional disturbance mitigating circumstance—evidence insufficient to require submission**

The trial court did not err by failing to submit to the jury in a first-degree murder sentencing hearing the statutory mitigating circumstance that defendant was under the influence of mental or emotional disturbance when the murder was committed based on evidence that defendant had a history of drug addiction and that he smoked some amount of crack cocaine eight hours before the murder, and on the testimony of a forensic psychiatrist tending to show that defendant was of average intelligence and was not psychotic; defendant suffered no hallucinations related to organic impairment of the brain; defendant's irritability and tenseness arose from underlying personality difficulties that made him have particular trouble coping with the murder charge, or from his lack of access to drugs or alcohol, or from feelings of a hopeless and depressive mood, but he was not clinically depressed; defendant presented shortcomings in his self-awareness and insight, but his understanding of his surroundings and reality was not impaired; defendant was capable of making and carrying out plans the night of the killing based on the description of his actions that night; the psychiatrist refused to opine that defendant was under the influence of mental or emotional disturbance the night of the murder but could state only that defendant was under the influence of some drugs or

alcohol; and defendant was a "person with a short fuse." Defendant's inability to control his drug habit or temper is neither mental nor emotional disturbance as contemplated by N.C.G.S. § 15A-2000(f)(2). Any error in the trial court's failure to submit this mitigating circumstance was harmless beyond a reasonable doubt since the jurors must have considered the foregoing evidence when they considered and found the catch-all mitigating circumstance and when they considered five other nonstatutory mitigating circumstances dealing with defendant's alleged mental condition and substance abuse.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

16. **Criminal Law § 1363 (NCI4th)— capital sentencing—life sentence of co-participant not mitigating circumstance**

The trial court did not err by refusing to allow defendant to present evidence in a capital sentencing proceeding concerning the life sentence received by a co-participant for the same murder and to submit this proposed mitigating circumstance to the jury. The decision of *Parker v. Dugger*, 498 U.S. 308, *reh'g denied*, 499 U.S. 932, did not impliedly hold that the sentence received by a codefendant is relevant evidence in mitigation as a matter of federal law.

**Am Jur 2d, Criminal Law §§ 598, 599.**

17. **Criminal Law § 1310 (NCI4th)— capital sentencing— defendant's refusal to testify at co-participant's trial—evidence and argument—harmless error**

Assuming *arguendo* that the trial court committed constitutional error in a capital sentencing proceeding by allowing the prosecutor to elicit testimony concerning defendant's refusal to testify at the trial of his co-participant and to comment upon that testimony during closing arguments, this error was harmless beyond a reasonable doubt where the prosecutor argued that defendant's refusal to testify in his co-participant's trial obviated the mitigating value of evidence that defendant rendered assistance to law officers to effect the apprehension of the co-participant, but the jury rejected this argument and found both the statutory mitigating circumstance that defendant aided in the apprehension of a capital felon and the nonstatutory circum-

stance that defendant confessed and cooperated with law officers the day following the crime.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**18. Criminal Law § 1323 (NCI4th)— capital sentencing—non-statutory mitigating circumstances—finding of mitigating value**

The trial court did not err by instructing the jury in a capital sentencing proceeding that it could exclude evidence of non-statutory mitigating circumstances from its consideration if it deemed the evidence to have no mitigating value.

**Am Jur 2d, Trial §§ 1441 et seq.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**19. Criminal Law § 447 (NCI4th)— capital sentencing—jury argument—sympathy for victim and family—no gross impropriety**

The prosecutor's closing argument in a capital sentencing proceeding that defendant contends was intended to evoke sympathy for the victim and her family, if improper, was not so grossly prejudicial as to require the trial court to intervene *ex mero motu.*

**Am Jur 2d, Trial §§ 648 et seq., 664 et seq.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

**20. Criminal Law § 455 (NCI4th)— death penalty—specific deterrence jury argument**

The prosecutor's closing argument in a capital sentencing proceeding that the jury should recommend the death penalty for defendant as a deterrent to his killing again was not improper.

**Am Jur 2d, Trial §§ 572 et seq.**

**Propriety, under Federal Constitution, of evidence or argument concerning deterrent effect of death penalty. 78 ALR Fed 553.**

**21. Criminal Law § 1316 (NCI4th)— capital sentencing— defendant's evidence of good character—rebuttal evidence of prior crimes**

Where the defendant offered evidence in a capital sentencing proceeding that he had been a loving and responsible son, sibling, and father, the prosecutor could properly cross-examine defendant's mother about defendant's prior convictions to rebut his good character evidence offered in mitigation. Rebuttal evidence about defendant's prior crimes was not limited to record evidence of those crimes but could include the circumstances of the crimes.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**22. Criminal Law § 536 (NCI4th)— outburst by defendant— denial of mistrial**

The trial court did not abuse its discretion by denying defendant's motion for a mistrial in a capital sentencing proceeding after defendant's profane outburst during the State's cross-examination of his mother about his prior convictions since the questions to defendant's mother were proper to rebut defendant's good character evidence offered in mitigation; if defendant was prejudiced, it was because of his own misconduct at trial, for which he cannot now complain; and following defendant's outburst, the court acted promptly and decisively to restore order by excusing the jury and allowing a short recess to dispel emotions.

**Am Jur 2d, Trial §§ 252 et seq.**

**Disruptive conduct of accused in presence of jury as ground for mistrial or discharge of jury. 89 ALR3d 960.**

**23. Criminal Law § 1373 (NCI4th)— first-degree murder— death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, where the jury found defendant guilty upon theories of lying in wait, premeditation and deliberation, and felony murder; the evidence supported the jury's finding of the aggravating circumstance that the murder was committed for pecuniary gain; the jury found it mitigating that defendant aided in the apprehension of his co-participant, confessed guilt to and cooperated with law officers the day following the crime, and that it was never

proven as to which firearm the defendant fired, but the jury refused to find any of the mitigating circumstances dealing with defendant's alleged drug abuse and drug intoxication on the night of the murder; the case involves a particularly cold, calculated, unprovoked and passionless killing committed to obtain the meager proceeds from the small convenience store the victim owned; defendant determined prior to the killing that he was going to rob and perhaps kill the victim, spent the day of the killing riding around with his co-participant, and when night came, armed himself with a semi-automatic rifle equipped with a telescope for better sighting and hid in a bush outside the back door of the victim's house; when the victim got out of her truck, defendant did not demand her possessions but simply started shooting; the victim suffered at least three non-fatal wounds before she was rendered unconscious by a fatal wound to the head from a shot fired from the semi-automatic rifle; the co-participant picked up the victim's money box and ran with defendant to their waiting car; and defendant displayed no remorse or contrition for his act.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

Appeal of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Sumner, J., at the 30 March 1992 Criminal Session of Superior Court, Pitt County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for conspiracy to commit murder, robbery with a dangerous weapon, and conspiracy to commit armed robbery was granted 16 March 1993. Execution stayed 29 April 1992 pending defendant's appeal. Heard in the Supreme Court 14 September 1993.

*Michael F. Easley, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the State.*

*DeLyle M. Evans and W. Gregory Duke for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried capitally on an indictment charging him with the first-degree murder of Dorothy Mae Smith. The jury returned a

verdict finding defendant guilty of first-degree murder upon the theories of premeditation and deliberation, lying in wait, and felony murder. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death.

The jury also found defendant guilty of conspiracy to commit murder, robbery with a dangerous weapon, and conspiracy to commit armed robbery. The trial court sentenced defendant to thirty years for the conspiracy to commit murder and forty years for the robbery, the sentences to run consecutively. It arrested judgment on the conspiracy to commit armed robbery conviction. For the reasons discussed herein, we conclude that the jury selection, guilt-innocence, and sentencing phases of defendant's trial were free from prejudicial error, and that the sentence of death is not disproportionate.

The State's evidence tended to show that the victim, Dorothy Mae Smith, and her husband, Seymour Smith, owned a convenience store. On 3 April 1991 the victim and her brother, William Earl Brown, closed the store around 10:30 p.m. Seymour Smith usually worked at the store, but he was in jail at the time on drug-related charges. Dorothy Mae Smith filled a money box with $4,000 in cash and an undetermined number of checks. She collected her personal belongings—including fruit, crackers, a comb, and a magazine—which she placed in a white plastic bag. She also picked up her husband's .38 caliber pistol. She got in her pickup truck and headed toward her house a short distance down the road from the store; her brother followed her home. At the house Smith turned into the driveway and went to the back of her house; her brother stopped in the road and watched until he saw her brake lights turn on.

At about 10:30 p.m. Lonnie Daniels, who lived next to the Smith house, was watching television. He heard sounds that at first he thought were exploding firecrackers, but he immediately realized they were gunshots—five shots fired in rapid succession. He went outside to investigate and saw only Smith's pickup truck parked at the back door of her house. He saw no one, and becoming concerned, he brought his friend Roy Roach to the Smith house, where they discovered Smith's body lying on the ground near the back door. There was blood coming from the back of her head, and she did not respond when they called her name. Roach telephoned 911 for assistance.

Pitt County Deputy Sheriff Kelvin Wilson arrived at 10:41 p.m. He found no vital signs in Smith. At 11:00 p.m., Deputy Sheriff Billy Tripp

arrived. The deputies observed Smith's body, fully clothed, lying two feet and eight inches from the back door of the house, with her feet nearest the house, her head away from the house, and a set of keys and prescription glasses on the ground near her hand. The pickup truck was parked on the drive near her head. They found an apple, some fruit, crackers, a comb, a deed, and four spent shell casings strewn in the driveway. Later, they found a .32 caliber bullet and a .22 caliber bullet at the base of an air conditioning unit, also near the house.

On 4 April 1991 Dr. M. G. F. Gilliland, the regional medical examiner, performed an autopsy on Smith. She testified Smith had been shot five times with small caliber firearms. She found gunshot wounds on the left side of the back of the head and neck area, on the left arm near the shoulder, on the left side of the chest, on the left side of her body near the back and just below the waist, and on the left arm. All the gunshots had been fired from a distance exceeding three to four feet from Smith. The wound to Smith's head would have been immediately incapacitating and the wounds to the chest and shoulder fatal if left untreated. The hematoma (bruise) on the right side of Smith's forehead, as well as the bruise to her right elbow, led Dr. Gilliland to conclude that Smith was immediately incapacitated by the gunshot wound to the head and died very quickly. Further, the angle of the other wounds, in conjunction with the hematoma, led her to conclude that the head wound occurred after the others.

Defendant was soon arrested on unrelated charges and gave the following oral statement, later reduced to writing by Detective Ivan Harris:

David stated that yesterday he came to Greenville and got up with Wesley Harris. David said Wesley said he had a job to do that night. David said Wesley said they were going to rob Seymour Smith's wife when she closed the store. He stated that they went by the store and she was there so they rode around until it got dark. David said about 10:00 p.m. that they parked Wesley's blue Saab car on the road that runs off between the store and the Smith house. We ran across the road and got in the bushes next to the driveway. I had a rifle and Wesley had a pistol. The rifle was a .22 caliber and the pistol was a .32 caliber. When Mrs. Smith pulled in the driveway and pulled around back and got out of the truck, we started shooting. Wesley ran and got the money box after she fell and we ran across the road and got in the car and

left. We put the money in the ditch near Empire Brushes. We got a money box and a white plastic bag. I called a cab and went to my girlfriend's house near Belvoir. Before I could get up with Wesley the next day, the cops got me. David said Wesley kept both guns that were used.

Defendant also signed a waiver of rights form and made the following written statement:

I David J. Ward come to Greenville yesterday and got in touch with Wesley Harris and he told me that he had a job to do he said that he was going to rob Seymour Smith's wife that night and he said that he might have to take her out. So we went by the store and she was there. We went riding until it got dark and when she close the store that night we went across the road we sat in the bushes and she pulled around the back and got out and that is when we started shooting. He went got the money box and ran across the road drove off and put the money up until the next day.

Based on information provided by defendant, and with defendant in the backseat of the sheriff's automobile, Deputy Sheriff Phillip Moore and three detectives drove to a rural area near Empire Brushes, Inc., to search for the money and checks stolen from Smith. Defendant physically assisted the officers in looking for the cash and checks.

Defendant also told officers that Harris might have placed the guns used in the murder at his residence. Defendant, while in the sheriff's car, pointed out Harris' blue Saab automobile. The officers immediately stopped the Saab and arrested Harris. Approximately $1004 in cash was located in Harris' automobile, as well as some marijuana. A moneybag and a box of .32 caliber automatic rounds were found on the side of a rural Pitt County road; some $2,429 in cash was found strewn nearby. A deputy retrieved—from a crawlspace under Harris' residence—a green duffel bag containing a .32 caliber semi-automatic pistol, two ammunition clips, one .22 caliber Ruger semi-automatic rifle, one .22 Westpoint bolt-action rifle, an unmounted Redfield power scope, three ammunition clips, and some .22 caliber long-rifle rounds.

S.B.I. Agent Ronald N. Marrs, who was assigned to the Firearm and Tool Mark Section of the Crime Laboratory, examined the shell casings and bullet fragments found in Smith's body, as well as the three firearms. He determined that the four .22 caliber casings found in the driveway were fired from the .22 caliber Ruger semi-automatic

STATE v. WARD

[338 N.C. 64 (1994)]

rifle, and the .32 caliber projectile was fired from the .32 caliber handgun found in the duffel bag. He could not, however, determine whether the .22 caliber projectile found near the air conditioning unit or the .22 caliber bullet fragments from Smith's body were fired from the Ruger; he stated that he could determine that they were not fired from the .22 caliber bolt action single-shot Westpoint rifle.

At the capital sentencing proceeding, defendant's younger brother, James Ward, testified that their father was a farm worker and defendant had picked cucumbers and worked in tobacco to support the impoverished family. Defendant began this farm work when he was eight years old. Defendant was profoundly affected by the death of their father when defendant was fifteen. Defendant assisted his family—for example, traveling great distances on foot to care for James when he was hospitalized with asthma.

Defendant's mother, Doris Ward, testified that defendant supported her financially. Defendant provided care for his blind grandmother and for his disabled uncle who was in a wheelchair—bathing the uncle, shaving him, and cutting his hair.

Defendant has one daughter for whom he has provided financial and emotional support.

Defendant's sister, Brenda Williams, testified that two days before the shooting defendant had been smoking crack in her mother's house, and that on the day of the shooting, she found a soda bottle used for smoking crack. Larry Perry saw defendant smoking crack with Harris the day of the shooting.

Dr. Patricio Lara, a forensic psychiatrist at Dorothea Dix Hospital, examined defendant and testified that defendant was of average intelligence; that defendant was not psychotic, although he did demonstrate an episode of agitation where he was suspicious and fearful of being harmed by others upon discharge from Dorothea Dix Hospital; and that defendant suffered no organic hallucinations related to organic impairment of the brain. Dr. Lara testified that defendant's irritability and tenseness suggested underlying personality difficulties that made him have particular trouble coping with the murder charges; or, given his supposed history of substance abuse, that his irritability and tenseness could have arisen from his then lack of access to drugs or alcohol, forcing him to face difficulties and cope without assistance of the previously available drugs or alcohol. His irritability and tenseness also could have arisen from probable feel-

ings of hopeless and depressive mood, but defendant was not clinically depressed.

Dr. Lara also testified that there were findings consistent with drug addiction; that defendant presented shortcomings in his self-awareness and insight, but his understanding of his surroundings and the reality he was living with was not impaired; and that defendant was capable of making and carrying out plans the night of the killing.

Defendant scored the lowest on the verbal portion of the intelligence test which in part measured judgment. He scored above average on other portions of the test. While in school, defendant was assigned to special education classes and classified as a slow learner.

Susan Clark, the court clerk in the Harris trial, testified that Harris was convicted of the same charges for which defendant was convicted. Over defendant's objection, she testified that defendant had been called to testify in the Harris trial and he refused.

Following the capital sentencing hearing, the jury found one aggravating circumstance—that the murder was committed for pecuniary gain; one statutory mitigating circumstance—that defendant aided in the apprehension of another capital felon; and two non-statutory mitigating circumstances—that defendant confessed guilt to and cooperated with law enforcement officers the day following the crime, and that it was never proven which firearm defendant fired on 3 April 1991.

Upon finding that the mitigating circumstances were insufficient to outweigh the aggravating circumstance, and that the aggravating circumstance was sufficiently substantial to call for the death penalty, the jury recommended, and the court imposed, a sentence of death.

## PRE-TRIAL ISSUES

[1] Defendant first contends the trial court erred in denying his motion for a continuance because of allegedly prejudicial pretrial publicity, thereby denying him his rights to a fair trial before an impartial jury under the Sixth and Fourteenth Amendments of the United States Constitution. The motion was filed in response to the publication, on the first page of an interior section in a Greenville newspaper, of an article which revealed that co-participant Harris had been convicted of the first-degree murder of Dorothy Mae Smith and sentenced to life imprisonment, and that

[t]estimony during the trial showed Harris and another man hid in the backyard of Mrs. Smith's home and ambushed her as she returned from Smith's Convenience Store which she operated with her husband.

A second suspect in the killing, David Junior Ward, thirty, of Route 6 Greenville, is scheduled to be tried March 30. Testimony showed bullets from Ward's gun killed Mrs. Smith. A bullet from Harris' gun was found near an air conditioner.

The article appeared the day after the mailing of notices for jury duty. The trial court denied the motion, stating, however, that "in the event we begin jury selection . . . and it appears that the venire is tainted somewhat, . . . there will be other appropriate remedies available to the defendant . . . to insure that the defendant . . . receives a fair trial from twelve fair and impartial jurors."

" '[D]ue process requires that the accused receive a trial by an impartial jury free from outside influences.' " *State v. Johnson*, 317 N.C. 343, 370, 346 S.E.2d 596, 611 (1986) (quoting *State v. Boykin*, 291 N.C. 264, 269, 229 S.E.2d 914, 917 (1976)). " '[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.' " *Id.* (quoting *State v. Richardson*, 308 N.C. 470, 478, 302 S.E.2d 799, 804 (1983) (motion for continuance because of prejudicial pretrial publicity)). The test for determining whether a continuance should be allowed or venue changed is whether " 'it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impression they might have formed.' " *State v. Yelverton*, 334 N.C. 532, 539-40, 434 S.E.2d 183, 187 (1993) (quoting *State v. Jerrett*, 309 N.C. 239, 255, 307 S.E.2d 339, 347 (1983) (motion for change of venue because of prejudicial pretrial publicity)).

The burden of proving the existence of a reasonable likelihood that he cannot receive a fair trial because of prejudice against him in the county in which he is to be tried rests upon the defendant. "In deciding whether a defendant has met his burden of showing prejudice, it is relevant to consider that the chosen jurors stated that they could ignore their prior knowledge or earlier formed opinions and decide the case solely on the evidence presented at trial." The determination of whether a defendant has carried his

burden of showing that pre-trial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion. The trial court has discretion, however, only in exercising its sound judgment as to the weight and credibility of the information before it, including evidence of such publicity and jurors' averments that they were ignorant of it or could be objective in spite of it. When the trial court concludes, based upon its sound assessment of the information before it, that the defendant has made a sufficient showing of prejudice, it must grant defendant's motion as a matter of law.

*Id.* at 540, 434 S.E.2d at 187 (*quoting Jerrett,* 309 N.C. at 255, 307 S.E.2d at 348) (citations omitted).

Defendant contends that the content and timing of the article here ensured that the jury would base its decision upon pretrial information rather than upon the evidence presented at trial, and thus precluded a fair and impartial trial. We disagree. We have recognized that " 'there may be cases where widespread, word-of-mouth publicity may be as damaging to a defendant's right to an impartial trial as mass media publicity.' " *Id.* (quoting *Boykin,* 291 N.C. at 271, 229 S.E.2d at 918). The record here, however, reveals that the State meticulously asked members of the venire whether they recalled reading, seeing, or hearing anything about the cases (defendant's and Harris'). None had read the recent article. Only eleven recalled reading, seeing, or hearing anything about the incident when it happened one year earlier. One had been called by the attorney for co-participant Harris and asked to be a character witness for Harris, who was her former student. One recalled hearing co-workers discuss the case. One had discussed the case with her husband after the first day of jury voir dire, and the trial court summarily excused her. All who remained and were impaneled stated without exception that they had not formed an opinion about the case and would be able to set aside whatever they had read, heard, or seen about the cases and decide this case entirely and completely upon the evidence presented at trial. Further, defendant did not exhaust his peremptory challenges and does not now contend that any juror impaneled was objectionable to him.

For these reasons, we hold that defendant has failed to carry his burden of showing a reasonable likelihood that pre-trial publicity might have affected the fairness of his trial, and that the trial court therefore properly denied defendant's motion for a continuance. *Compare Yelverton,* 334 N.C. at 540-41, 434 S.E.2d at 187-88 (defend-

ant failed to carry his burden and court properly denied his motion for a change of venue where counsel scrupulously asked venire members whether they had read or heard about the case from any source; those who admitted to having difficulty putting aside previously formed opinions were excused for cause; and those who remained and were impaneled stated without exception either that they had formed no opinion or that they could put what they had heard or read out of their minds and listen objectively to the evidence) *with Jerrett*, 309 N.C. at 250-58, 307 S.E.2d at 345-49 (defendant met his burden of showing, under the totality of the circumstances, that a reasonable likelihood existed that he could not receive a fair trial where the crimes occurred in a small, rural, closely-knit county; several attorneys, a magistrate, and a deputy sheriff testified it would be extremely difficult, if not impossible, to select a jury of individuals who had not heard about the case, due to the publicity surrounding the case; due to the publicity surrounding the case, potential jurors were likely to have formed preconceived opinions about defendant's guilt; and jury voir dire, conducted after the trial court denied defendant's motion for sequestration and individual voir dire, revealed that many potential jurors stated they knew the victim or potential State's witnesses, had already formed opinions in the case, or could not give defendant a fair trial). This assignment of error is overruled.

[2]   Defendant next contends the trial court erred by denying his motion for sequestration and individual voir dire of prospective jurors. He basically argues that the presence of all the prospective jurors during voir dire allowed many jurors to observe others being excused for cause due to their opposition to the death penalty and to frame their responses so as to achieve disqualification as well. Defendant contends that, for this reason, the Eighth and Fourteenth Amendments to the United States Constitution require individual voir dire to ensure the sincerity of the responses of potential jurors with regard to their views on capital punishment.

"In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time." N.C.G.S. § 15A-1214(j) (1988). "This statute gives neither party an absolute right to such a procedure." *State v. Murphy*, 321 N.C. 738, 740, 365 S.E.2d 615, 617 (1988). Instead, whether to grant individual voir dire is within the sound discretion of the trial court and its ruling will not be disturbed absent a showing of abuse of discretion. *Id.* In *State v. Wilson*, 313 N.C. 516, 523-24, 330 S.E.2d 450, 456-57 (1985), we held that the argument defendant now propounds is speculative and does not suffice to show

that denial of the motion for individual voir dire was an abuse of discretion. We find no compelling reason to depart from our prior holding.

Defendant basically contends, in the alternative, that pre-trial publicity concerning the case was so widespread that sequestration and individual voir dire were necessary in order to allow inquiry into the extent of the familiarity prospective jurors had with the case without exposing the entire panel to the prior knowledge of some individuals. We disagree. The State inquired collectively of all potential jurors whether any recalled reading, hearing, or seeing anything about the case before coming to court. As to those who answered in the affirmative, the State inquired further whether they had, as a result, formed an opinion about the case, or whether, if selected, they could set aside whatever they recalled and decide the case entirely upon the evidence. All responded that they had not formed an opinion and could set aside whatever they recalled and decide the case entirely upon the evidence. One stated that she had discussed the case with her husband the previous evening after the trial court had charged potential jurors not to discuss the case. The court summarily excused her; she did not relate the nature of the discussion. Further, during the questioning only the panel members seated in the jury box were in the courtroom; all other selected or potential jurors were sequestered outside the courtroom. Defendant did not pursue the inquiry about pre-trial publicity, and he accepted three jurors who had recalled seeing, hearing, or reading something about the case, as well as the one juror who knew something about the case because she had been contacted by counsel for co-participant Harris as a potential character witness.

Further, defendant did not exhaust his peremptory challenges and therefore was not forced to accept any juror objectionable to him. Further still, potential jurors who recalled seeing, hearing, or reading something about the cases were not asked to recite what they recalled. Thus, it cannot be said that those jurors exposed the others present in the courtroom to any prejudicial pre-trial publicity or that the jury selection process resulted in the contamination of other jurors by information from jurors previously exposed to such pre-trial publicity.

For these reasons, we conclude that defendant has failed to show that the trial court abused its discretion by denying his motion for sequestration and individual voir dire. This assignment of error is overruled.

STATE v. WARD

[338 N.C. 64 (1994)]

Jury Selection Issues

[3] Defendant contends the trial court erred by excusing certain jurors for cause for their views on the death penalty without affording him an opportunity to examine the jurors excused, thereby denying him his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Prospective jurors cannot be excused for cause simply because they voice general objections to capital punishment, but can be so excused if they express an unmistakable commitment to vote against the death penalty regardless of the facts and circumstances. *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, *reh'g denied*, 393 U.S. 898, 21 L. Ed. 2d 186 (1968). A juror cannot properly be excused for cause for his views on capital punishment unless those views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). In *Wainwright* the Court recognized that

> [t]he state of th[e] case law leaves trial courts with the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial.

*Id.* at 421, 83 L. Ed. 2d at 850 (emphasis in original omitted). We have recognized that a prospective juror's bias may not always be "provable with unmistakable clarity" and that "[i]n such cases, reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially." *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990).

"Both the defendant and the State have the right to question prospective jurors about their views on capital punishment." *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 908 (1993). The extent and manner of such inquiry, however, lies within the trial court's discretion, and its ruling will not be disturbed absent abuse of discretion. *Id.* Moreover, the trial court does not abuse its discretion

> "[w]hen challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the

court, . . . at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged [about the same matter]."

*Id.* at 44, 430 S.E.2d at 908 (quoting *State v. Hill*, 331 N.C. 387, 403, 417 S.E.2d 765, 772 (1992), *cert. denied*, —— U.S.——, 122 L. Ed. 2d 684, *reh'g denied*, —— U.S. ——, 123 L. Ed. 2d 503 (1993)).

The trial court here extensively prefaced its questions about capital punishment and described the procedure followed in a capital sentencing proceeding. Addressing each juror individually, the court explained: "If the jury finds the defendant guilty of first-degree murder, the law of North Carolina requires that the jury then consider evidence of aggravating and mitigating circumstances and determine whether the defendant should be sentenced to death." The court paused and asked whether the juror understood. It then continued:

The law further provides that it is the duty of the jury to recommend that the defendant be sentenced to death if the State satisfies the twelve jurors beyond a reasonable doubt of three things: First, that one or more of the aggravating circumstances prescribed by statute exists. Second, that the aggravating circumstances are sufficiently substantial to call for the imposition of the death penalty. And third, that any mitigating circumstances found to exist are insufficient to outweigh the aggravating circumstances found.

The court paused again and asked whether the juror understood. It then explained: "If the State fails to satisfy the jury of all of these three things, it is the duty of the jury to recommend life imprisonment." The court asked whether the juror understood, and if the juror understood, only then asked the juror the following three questions, as illustrated through the questioning of prospective juror McCrae:

COURT: If you are satisfied beyond a reasonable doubt of those things necessary to constitute first degree murder, can and will you vote to return a verdict of guilty of first degree murder, can and will you vote to return a verdict of guilty of first degree murder even though you know that death is one of the possible penalties?

JUROR MCCRAE: Yes.

**STATE v. WARD**

[338 N.C. 64 (1994)]

COURT: Ms. McCrae, considering your personal beliefs, ma'am, about the death penalty, please state for me whether you would be able or unable to vote for a recommendation of the death penalty even though you are satisfied beyond a reasonable doubt of the three things required by law concerning the aggravating and mitigating circumstances previously mentioned?

JUROR McCRAE: No, I could not.

COURT: Is that an able or an unable response, ma'am?

JUROR McCRAE: I would be unable.

COURT: You would be unable?

JUROR McCRAE: Yes.

COURT: If the defendant is convicted of first degree murder, ma'am, can and will you follow the law of North Carolina as to the sentence recommendation to be made by the jury as the court will explain it to you?

JUROR McCRAE: Yes, I could.

COURT: Ms. McCrae, I'm going to excuse you for cause. Madame Clerk, the Court finds the fact that Ms. McCrae is being excused for cause. The reason is as a matter of conscience, regardless of the facts and circumstances, she would be unable to render a verdict with respect to the charge and with respect to G.S. 15A-1212(8).

Defendant contends that these responses—and the similar responses of seventeen other potential jurors, six of whom answered that they could not and would not vote to return a verdict of guilty of first-degree murder knowing that death is one of the possible penalties—were ambiguous. All, defendant contends, responded that they would be unable to vote for the death penalty, but that they could and would follow the law as to the sentence recommendation. Therefore, defendant concludes, these prospective jurors were improperly excused for cause, and additional questioning by defendant would have shown that they were qualified to sit as jurors under the *Witherspoon-Witt* standard.

The record discloses that the jurors unambiguously stated that they could not or would not vote to return a verdict of guilty of first-degree murder knowing that death is one of the possible penalties, or that they would not be able to vote for the death penalty even though they were satisfied beyond a reasonable doubt that one or more of the

aggravating circumstances prescribed by statute existed, the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty, and any mitigating circumstances found to exist were insufficient to outweigh the aggravating circumstances found. *See State v. Oliver*, 302 N.C. 28, 39, 274 S.E.2d 183, 191 (1981) (excusal for cause is proper when a juror admits "a specific inability to impose the death penalty under any circumstances"). Because the jurors were unequivocal about their inability to vote for the death penalty, additional questioning by defendant would not likely have produced different answers. Therefore, we hold that the trial court properly excused the jurors for cause and did not abuse its discretion by refusing to allow defendant to question them. *See Hill*, 331 N.C. at 402-03, 417 S.E.2d at 771-72 (juror unequivocally stated she would not be able to follow the law; no abuse of discretion to deny further questioning, defendant did not show that such would likely have produced different answers); *Johnson*, 317 N.C. at 376-78, 346 S.E.2d at 614-15 (although juror initially stated that her views on capital punishment would not affect her ability to reach a decision at the guilt phase, she then said she would not under any circumstances later vote to impose the death penalty at the sentencing phase; held, the trial court properly allowed the challenge for cause and properly denied defendant's request to rehabilitate her, because she expressed a clear refusal to invoke the death penalty). This assignment of error is overruled.

[4] In his next assignment of error, defendant contends that the trial court erred by sustaining objections to certain of his questions to jurors, thereby precluding him from examining those jurors concerning the non-mandatory nature of the capital sentencing statute. On the second day of jury selection, counsel for defendant attempted to ask the following question:

[DEFENSE COUNSEL TO PROSPECTIVE JURORS]: A real important question is do all of you understand that our law only requires you to consider death, the death penalty. It does not require you to be for the death penalty. It does not require you to go back and find the death penalty. All these questions that you have been hearing from the Judge only mean can you consider death. You don't have to be 100 percent for death or any fraction for death. All you do is consider.

[PROSECUTOR]: I would object. That's not the statutory [sic].

COURT: Ladies and gentlemen, at the appropriate time I will instruct you on the law that you are to apply, if and when we

reach that stage. Mr. Evans, if you want to talk with them about that matter, sir, you need to follow the statute as outlined.

Counsel for defendant then rephrased the question. On the fourth day, counsel for defendant attempted to ask a similar question: "Do you understand that the law only requires *you to consider the death penalty* and it is up to you and the other jurors whether or not our client gets it?" The court sustained the objection and suggested that counsel avoid confusion by "giv[ing] it to them in the context of the statute." Counsel for defendant, however, did not rephrase the question.

Defendant contends he was attempting both to educate potential jurors about their role in the capital sentencing proceeding and to determine whether they fully understood their obligations and could consider a life sentence. By sustaining the objection, defendant contends, the court denied him his rights under our Criminal Procedure Act to question each prospective juror concerning his or her fitness and competency to serve as a juror, and under the Sixth and Fourteenth Amendments to the United States Constitution, as enunciated in *Morgan v. Illinois*, 504 U.S. —, 119 L. Ed. 2d 492 (1992), to an adequate voir dire to determine whether prospective jurors could consider a life sentence. We disagree.

The Criminal Procedure Act provides:

The prosecutor and the defense counsel, or the defendant if not represented by counsel, may personally question prospective jurors individually concerning their fitness and competency to serve as jurors in the case to determine whether there is a basis for a challenge for cause or whether to exercise a peremptory challenge.

N.C.G.S. § 15A-1214(c) (1988). This statute

does not preempt the exercise of all discretion by the trial judge during the jury selection process. . . . The trial judge has broad discretion "to see that a competent, fair and impartial jury is impaneled and rulings of the trial judge in this regard will not be reversed absent a showing of abuse of discretion."

*State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980) (quoting *State v. Johnson*, 298 N.C. 355, 362, 259 S.E.2d 752, 757 (1979)).

In *Morgan* the United States Supreme Court held that a defendant is "entitled, upon his request, to inquiry discerning those jurors

who, even prior to the State's case-in-chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *Morgan,* 504 U.S. at ——, 119 L. Ed. 2d at 507. The trial court must give a defendant, through jury voir dire, an opportunity "to lay bare the foundation of [his] challenge for cause against those prospective jurors who would always impose death following conviction." *Id.* at ——, 119 L. Ed. 2d at 506. In *Morgan* the defendant had unsuccessfully attempted to ask whether the juror would "automatically vote to impose the death penalty no matter what the facts are." *Id.* at ——, 119 L. Ed. 2d at 499.

The questions and prefatory comment here bear no resemblance to the question that must be allowed under *Morgan.* Further, the trial court apparently sustained the objection only as to the form of the question and allowed counsel for defendant to rephrase the question. Counsel for defendant expansively explained what he meant by "our law requires you only to consider the death penalty" across more than six pages of the transcript after the first question, but declined to do so after the second. We conclude that the trial court properly sustained the objections to these questions. Both were confusing and did not "follow the statute" as the trial court recommended to defense counsel.

Assuming *arguendo* that the trial court was required under *Morgan* to allow these two questions, any error in excluding them was harmless. Defendant was allowed to engage in the line of inquiry that must be allowed under *Morgan,* as illustrated through the questioning of juror Gentry, whom defendant subsequently selected:

[DEFENSE COUNSEL]: You do believe in capital punishment?

[JUROR GENTRY]: Yes.

[DEFENSE COUNSEL]: You think we should have capital punishment for crimes besides murder?

[JUROR GENTRY]: I've not given consideration to that.

[DEFENSE COUNSEL]: Have you discussed your views about capital punishment lately with anybody else?

[JUROR GENTRY]: No.

[DEFENSE COUNSEL]: How do you feel about people who are against capital punishment?

[JUROR GENTRY]: I haven't given any consideration to that either.

[DEFENSE COUNSEL]: Do you have any religious basis for your views on capital punishment?

[JUROR GENTRY]: Well, as I said before, in the beginning an eye for an eye. I think I have my personal views.

[DEFENSE COUNSEL]: So your views are basically based on an eye for an eye, a tooth for a tooth?

[JUROR GENTRY]: Yes.

[DEFENSE COUNSEL]: Are you able to also consider life imprisonment?

[JUROR GENTRY]: Oh, Yes. I think I can lay aside, you know, I think I can.

[DEFENSE COUNSEL]: So you don't think all murderers should be punished by the death penalty?

[JUROR GENTRY]: No.

[DEFENSE COUNSEL]: Have you had a relative or close friend murdered?

[JUROR GENTRY]: No, not that I'm aware of.

We thus hold that any error arising from the objection to the questions previously asked was harmless beyond a reasonable doubt because defendant was allowed to engage in the line of inquiry through further voir dire. This assignment of error is overruled.

## GUILT PHASE ISSUES

[5] Defendant contends that the trial court erred by denying his motion for mistrial and taking no remedial action after an emotional outburst by the victim's husband during defendant's opening statement. Counsel for defendant made the opening statement without pause, and only afterwards moved for a mistrial, stating that he had "noticed.the jurors kept looking to their left and [he] didn't know what was going on." Defendant offered as proof testimony by the prosecutor, Thomas Haigwood, and the victim's spouse, Seymour Smith. Haigwood testified that he was seated three or four feet directly in front of Smith and that he heard Smith sobbing or crying "or some anguish behind me," but did not hear words being said. Smith testified that he just burst out and started crying "because you were just talking wrong about my wife," that somebody took him out of the

courtroom, and that he said something while outside the courtroom door. The trial court denied the motion for mistrial, stating:

> Let the record reflect . . . that . . . Mr. Smith . . . was present in court during the opening statements of both the State and the defendant and that he, in fact, by his own admission was sobbing and crying. . . . In the opinion of the court . . . the jury has not been tainted by the actions of Mr. Smith at this time.

Our statute provides, in pertinent part:

> Upon motion of a defendant or with his concurrence the judge may declare a mistrial at any time during the trial. The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case.

N.C.G.S. § 15A-1061 (1988). Whether to grant a motion for mistrial rests in the sound discretion of the trial court. *State v. Blackstock*, 314 N.C. 232, 243, 333 S.E.2d 245, 252 (1985). "A mistrial is appropriate only when there are such serious improprieties as would make it impossible to attain a fair and impartial verdict under the law." *Id.* at 243-44, 333 S.E.2d at 252.

> When such an incident involving an unexpected emotional outburst occurs, the judge must act promptly and decisively to restore order and to erase any bias or prejudice which may have been aroused. Whether it is possible to accomplish this in a particular case is a question necessarily first addressed to the sound discretion of the trial judge. "Not every disruptive event occurring during the course of trial requires the court automatically to declare a mistrial," *State v. Dais*, 22 N.C. App. 379, 384, 206 S.E.2d 759, 762 (1974), and if in the sound discretion of the trial judge it is possible, despite the untoward event, to preserve defendant's basic right to receive a fair trial before an unbiased jury, then the motion for mistrial should be denied. On appeal, the decision of the trial judge in this regard is entitled to the greatest respect. He is present while the events unfold and is in a position to know far better than the printed record can ever reflect just how far the jury may have been influenced by the events occurring during the trial and whether it has been possible to erase the prejudicial effect of some emotional outburst. Therefore, unless his ruling is

clearly erroneous so as to amount to a manifest abuse of discretion, it will not be disturbed on appeal.

*State v. Sorrells*, 33 N.C. App. 374, 376-77, 235 S.E.2d 70, 72 (quoted in *Blackstock*, 314 N.C. at 244, 333 S.E.2d at 253).

Defendant contends there was substantial and irreparable prejudice to his case. We perceive no such prejudice. Smith spoke no words but only sobbed and immediately left the courtroom. The incident was apparently over quickly and caused minimal interruption; the court reporter never noted its occurrence as he transcribed defendant's opening statement. Counsel for defendant gave the entire opening statement without pause, and only noticed that the jurors looked leftward at some point during his opening statement. For these reasons, we conclude that Smith's emotional outburst was not so prejudicial to defendant as to render the denial of the motion for mistrial a manifest abuse of discretion reversible on appeal.

Within the same assignment of error, defendant contends the trial court should have given a curative instruction with regard to the outburst. Defendant, however, made no request for a curative instruction. We stated with regard to a similar incident:

Our rule has long been that where a charge fully instructs the jury on substantive features of the case, defines and applies the law thereto, the trial court is not required to instruct on a subordinate feature of the case absent a special request. The trial judge in this case witnessed the outburst and was in a position to gauge its effect on the jury. . . . Aside from defendant's failure to request a curative instruction, such an instruction may well have highlighted the witness's emotional state; indeed it is possible that the defense attorney declined to request a curative instruction because of the likelihood that it would emphasize the witness's outburst.

*Blackstock*, 314 N.C. at 245, 333 S.E.2d at 253 (citation omitted).

As in that case, we hold that the court here did not err in failing to give, *ex mero motu*, a curative instruction with regard to this matter. *See also State v. Locklear*, 322 N.C. 349, 359-60, 368 S.E.2d 377, 383-84 (1988) (court did not err in failing to give curative instruction; defendant did not request such instruction, and court witnessed outburst and was in a position to gauge its effect on the jury). This assignment of error is overruled.

**[6]** Defendant next contends the trial court erred by prohibiting him from introducing evidence that the victim's husband was incarcerated on felony drug charges the night of the shooting, thereby denying defendant his rights under the Sixth and Fourteenth Amendments to the United States Constitution to present relevant evidence. The prosecutor filed a written motion in limine for an order to prohibit defendant "from offering or eliciting any evidence . . . which directly or indirectly informs or implies the nature of the charges for which Seymour Smith was arrested and imprisoned on or about the time of Dorothy Mae Smith's murder." The trial court ordered defendant to refrain "from making any reference or implying directly or indirectly about the incarceration of Seymour Smith."

The evidence showed that the area in or around Smith's trailer park had a reputation as an area in which drugs were bought and sold; that Seymour Smith owned eleven homes, thirty-five mobile homes, and a Mercedes automobile; and that on the night of the shooting the victim was carrying an unusually large amount of cash and a gun belonging to Seymour Smith. Defendant argues the evidence of pending drug charges against Smith was relevant to show that drugs may have been hidden at the Smith house, from which the jury could have inferred that defendant was at the Smith house to steal the cocaine hidden inside the house, and further, that defendant would not have planned to kill the only person other than Seymour Smith himself who could lead him to the cocaine. Thus, the excluded evidence was relevant to show that defendant did not have the specific intent to kill Dorothy Mae Smith. We disagree.

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly or by these rules." N.C.G.S. § 8C-1, Rule 402 (1992). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992); *see State v. Perry*, 298 N.C. 502, 510, 259 S.E.2d 496, 501 (1979) (evidence is relevant if it has "*any* logical tendency, however slight, to prove a fact in issue in the case").

To convict defendant of first-degree murder on the theory of premeditation and deliberation required proof beyond a reasonable

doubt of a specific intent to kill.[1] The pending criminal charges against Seymour Smith were not relevant to show that defendant did not have the specific intent to kill Dorothy Mae Smith. The evidence had no logical tendency to show that there were drugs hidden in the house, and it thus could not reasonably support an inference that defendant was at the house to steal cocaine and could not have planned to kill the only person who could lead him to the cocaine. Any connection between the pending charges evidence and these inferences was tenuous and remote. Further, these inferences were directly contradicted by defendant's own statement that co-participant Harris told him he had a job to do, namely, to rob, and perhaps kill, Dorothy Mae Smith; that he rode around with Harris; that he waited, armed with a rifle, with Harris in a bush behind the house; and that when Dorothy Mae Smith got out of her truck, he "started shooting." Therefore, we conclude that the pending charges evidence was not relevant and hold that the court did not err in excluding it. This assignment of error is overruled.

[7] Defendant next contends the trial court erred in denying his motion in limine to prohibit the State from introducing a Redfield telescope into evidence. The evidence at trial disclosed that the victim had been shot from a distance of more than three or four feet by bullets from a .22 caliber rifle and that the shots were fired in rapid succession. Defendant, when he gave his statement to the deputy sheriff, said he fired a .22 caliber rifle at the victim. Defendant supplied the information as to where the .22 caliber rifle was located. When the premises of the co-participant were searched, a duffel bag was discovered containing, among other things, a .22 caliber Ruger

---

1. Murder in the first degree [based upon the theory of premeditation and deliberation] is the unlawful killing of a human being with malice and with premeditation and deliberation. "Premeditation" is defined as thought beforehand, for some length of time, however short. "Deliberation" means an intent to kill carried out by the defendant in a cool state of blood. *A specific intent to kill is a necessary constituent of the elements of premeditation and deliberation.* Proof of premeditation and deliberation is proof of that intent.

*State v. Young,* 324 N.C. 489, 493, 380 S.E.2d 94, 96 (1989) (emphasis added) (citations omitted).

Defendant was convicted also of first-degree murder on the theories of felony murder and lying in wait, neither of which requires proof of a specific intent to kill. *See, e.g., State v. Baldwin,* 330 N.C. 446, 462, 412 S.E.2d 31, 40-41 (1992) ("Like poison, imprisonment, starving, and torture—the other physical acts specified in N.C.G.S. § 14-17—lying in wait is a method employed to kill. *It does not require a finding of any specific intent.*" (emphasis added) (citation omitted)).

semi-automatic rifle with mounting bracket and a Redfield 2½ power telescope used on rifles. There were "scrape marks" on the mounting bracket on the Ruger corresponding to "scrape marks" on the telescope, and at least two of the bullets inflicting fatal wounds on the victim were fired from the Ruger.

Under the rules of evidence set forth under the preceding assignment of error, defendant contends that the evidence of the telescope was not relevant and was therefore inadmissible, and that its admission prejudiced his case because it constituted additional evidence of premeditation and deliberation by tending to show that defendant armed himself with a rapid-firing weapon equipped with a telescopic sight. We disagree.

While there was no direct evidence that defendant mounted the telescope on the rifle, the evidence adduced supports an inference that the telescopic sight had been mounted on the rifle the night of the killing. The physical evidence in the form of shell casings and expended bullets found around the bush connected the Ruger with a killing done from a distance in low light, the type of situation that would call for a telescopically equipped weapon. Further, the dismounted telescope was found the next day in the bag with the other guns and ammunition used in the shooting. Finally, defendant stated that he and Harris waited until night to rob the victim and that he fired a .22 caliber rifle. We conclude that the evidence of the telescope was relevant to show that defendant and Harris armed themselves to hit a distant target at night in low light, and thus that defendant premeditated and deliberated the killing.

Defendant contends, in the alternative, that the trial court erred by admitting evidence of the telescope because the probative value of the evidence was outweighed by the risk of unfair prejudice, confusion of issues, or misleading the jury. *See* N.C.G.S. § 8C-1, Rule 403 (1992). In general, the exclusion of evidence under the Rule 403 balancing test is within the sound discretion of the trial court, whose ruling will not be disturbed absent abuse of discretion. *See, e.g., State v. Syriani*, 333 N.C. 350, 379, 428 S.E.2d 118, 133, *cert. denied*, — U.S. —, 126 L. Ed. 2d 341 (1993), *reh'g denied*, — U.S.—, 126 L. Ed. 2d 707 (1994). In light of the clear relevance of the telescope, as discussed above, the trial court did not abuse its discretion by failing to exclude the evidence pursuant to the Rule 403 balancing test. This assignment of error is overruled.

STATE v. WARD

[338 N.C. 64 (1994)]

**[8]** Defendant next contends the trial court erred by prohibiting the medical examiner from testifying about the number of gunshots reported by a neighbor. During cross-examination defendant asked Dr. Gilliland whether she had any information as to about how many shots were heard by anyone. The State objected to the question, and the trial court sustained the objection. Outside the presence of the jury, Dr. Gilliland testified: "My notes reflect one of the deputies told me that [some neighbor told the deputy that the neighbor heard between three and five shots on the night of 3 April 1991]." Defendant contends the testimony was relevant to impeach the testimony of State's witness Lonnie Daniels, who had testified that he heard five gunshots in rapid succession and, upon cross-examination by defendant, that he did not recall telling anyone he had heard between three and five gunshots. Defendant contends that exclusion of such relevant evidence prejudiced his case because it suggested he was so in control of his faculties that he, with deadly precision, hit Dorothy Mae Smith with each shot fired, and thus undermined his defense that he was "high as a kite" on drugs or alcohol.

"The credibility of a witness may be attacked by any party, including the party calling him." N.C.G.S. § 8C-1, Rule 607 (1992).

"The primary purpose of impeachment is to reduce or discount the credibility of a witness for the purpose of inducing the jury to give less weight to his testimony in arriving at the ultimate facts of the case." Any circumstance tending to show a defect in the witness's perception, memory, narration or veracity is relevant to this purpose.

*State v. Looney*, 294 N.C. 1, 15, 240 S.E.2d 612, 620 (1978) (quoting Stansbury, *North Carolina Evidence*, Brandis Rev. §§ 38, 42, 44).

Unless such impeachment is barred by constitutional principles, or by statute, or by a proper claim of privilege, a witness may be impeached by proof that on other occasions [he] has made statements inconsistent with [his] testimony. Such statements may have been made orally, either extrajudicially or as testimony at a former trial or hearing, or may have been in writing. . . .

Inconsistency does not, *per se*, make statements admissible as substantive evidence or nullify the testimony of the witness. Inconsistent statements are admissible simply for the consideration of the jury in determining the witness's credibility. Hence

they are not ordinarily admissible until the witness has testified to something with which they are inconsistent . . . .

Inconsistent statements are not made inadmissible for impeachment because of some rule making them inadmissible as substantive evidence. . . . *[But] [t]he making of the statements must be proved by direct evidence and not by hearsay; and a witness may not be impeached by the inconsistent statements of someone else.*

1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 159, at 523-28 (4th ed. 1993) [hereinafter 1 *Broun on Evidence*] (emphasis added). "Proof of a prior statement by a witness who heard it at second hand would clearly be inadmissible." *Id.* § 159, at 528 n.411; *see State v. Whit,* 50 N.C. 224, 230-31 (1858) (improper for counsel, in order to contrast testimony of witnesses at current and former trials, to read to jury the report of the decision of the Supreme Court rendered on appeal from judgment at former trial).

Because the statement defendant alleges the witness made to the deputy relates to material facts in the testimony, namely, the number of gunshots heard on the night of the killing, it may be proved by others—the deputy, for example, or a bystander who overheard the witness make the statement to the deputy. *See* 1 *Broun on Evidence* § 161, at 531. However, defendant sought to prove the prior inconsistent statement by a witness who heard second hand from the deputy that a neighbor told the deputy the neighbor heard between three and five shots. Even assuming that that neighbor was Daniels, such secondhand proof is clearly inadmissible, and the trial court did not err in excluding it. This assignment of error is overruled.

Defendant next contends the trial court erred by failing to intervene *ex mero motu* to correct the prosecutor's grossly prejudicial closing arguments.

"[C]ounsel [generally] will be allowed wide latitude in the argument of hotly contested cases. Counsel for each side may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his or her side of the case. Decisions as to whether an advocate has abused this privilege must be left largely to the sound discretion of the trial court."

*State v. Brown,* 320 N.C. 179, 194, 358 S.E.2d 1, 12-13, *cert. denied,* 484 U.S. 970, 98 L. Ed. 2d 406 (1987) (quoting *State v. Huffstetler,* 312

N.C. 92, 112, 322 S.E.2d 110, 123 (1984), *cert. denied,* 471 U.S. 1009, 85 L. Ed. 2d 169 (1985) (citations omitted)).

> "In capital cases . . . an appellate court may review the prosecution's argument, even though defendant raised no objection at trial, but the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it."

*Id.* at 194-95, 358 S.E.2d at 13 (quoting *Johnson,* 298 N.C. at 369, 259 S.E.2d at 761).

Defendant first complains specifically about the following remarks:

> Now, I'm going to tell you, folks, I didn't hear any of that evidence come from the witness stand. Why would he tell you this, why? Smoke. I mean, if he knows all this—I mean, I'd like for him to put a hand on the Bible, take an oath. He had every opportunity to get up here and tell it, if that is what he knows. He didn't do it.
>
> . . . .
>
> Why did he tell this? Why did he tell you that is what the evidence was going to be? You haven't heard it. And I know yesterday afternoon, certainly, when I stood up and said the State rests—Judge sent you out and you all came back in. The Judge said, All right, Mr. Evans [defense counsel], what is the showing for the defendant—I know you were surprised. I know you were. I was.
>
> Where is all this stuff, Mr. Evans? This case is a year since this murder occurred. Have you—he didn't know what the evidence was going to be? I mean, the co-defendant was tried several weeks ago. He would have you believe he and Mr. Duke weren't sitting here watching every bit of that trial.

Prior to these comments, the prosecutor had referred to the opening statement made by counsel for the defendant:

> He [defense counsel] said to you that there will be evidence that will show that Wesley Thomas Harris thought that there was cocaine in Dorothy Mae Smith's house and that he went and told

[defendant] about it and said, you know, I'm going to go rob, go down there to Dorothy Mae Smith's house, this house that I think cocaine is in, and we are going to hide there. And when she comes, we are going to force her to go in the house and show us where the cocaine is. This is what he is telling you that the evidence is going to be. . . .

He said that the evidence would show that Wesley dropped the defendant Ward off and came back later that afternoon and picked him up again. And then . . . the defendant . . . smoked some more cocaine. And that then they rode out there to the store, saw the deceased, Dorothy Mae Smith, still in the store and went and parked the car and got in the bushes. And that David Ward was high as a kite. . . . There ain't one scintilla of evidence about that.

And then he goes on to say . . . that Wesley . . . pulled out a .32 and he gave [defendant] the bolt action [single shot Westpoint .22 caliber rifle] and that at that time the deceased . . . drives up in the driveway and she gets out of her car. And he, that is one or both of them, saw this gun, this .38 that she had, and they got scared. Well, did you hear any evidence of that?

And that at that point Wesley pulled out the Ruger too.

[9] Defendant contends that by arguing that he failed to produce the forecasted evidence, the prosecutor was improperly commenting on the exercise of his right not to testify, because he is the only witness who could have produced that evidence. We disagree. Defendant was not the only witness who could have produced the forecasted evidence. Defendant himself argued that the evidence presented by the State, reasonable inferences therefrom, and gaps and deficiencies therein, supported defendant's version. Further, and defendant so concedes, the prosecutor directed the remarks at counsel for defendant and never commented directly on defendant's failure to testify or suggested that defendant should have or even could have testified. "The State may not comment upon the defendant's failure to testify but may draw the jury's attention to the failure of the defendant to produce exculpatory evidence or evidence to contradict the State's case." *State v. Erlewine*, 328 N.C. 626, 633, 403 S.E.2d 280, 284 (1991). We conclude that the prosecutor's remarks were not a comment on defendant's failure to testify, but fair and proper comments on defendant's failure to present any evidence. *See id.* (prosecutor argued "[t]here is a huge difference between denying and contradicting. . . . If you think about it . . . there is not one scintilla of evidence

to contradict anything, any testimony or any exhibits presented by the State in this case"; held, arguments were fair and proper commentary on defendant's failure to present any evidence); *State v. Roper*, 328 N.C. 337, 362, 402 S.E.2d 600, 614-15, *cert. denied*, — U.S. —, 116 L. Ed. 2d 232 (1991) (prosecutor argued that "[defendant] tells you—he says I've got a defense. He says it's self-defense. If he's got a self-defense, then let him present it"; noting that the prosecutor was responding to defendant's assertion that the State's case rested solely on a witness's testimony, the Court stated "it was not inappropriate for the prosecutor to point out that the witness to defendant's alleged acts of self-defense had not come forward to testify," and held the remarks were not a comment on defendant's failure to testify).

[10] Defendant also excepts to a portion of the prosecutor's closing argument in which he stated:

> I know that you couldn't help but see Mr. Seymour Smith sobbing, leaving the courtroom when he was saying . . . [the] evidence is going to show that they were there to force his wife to find cocaine in the house. And you saw the man walk out sobbing out of the courtroom. Wouldn't you at least expect him, after doing that, to put on some evidence to support it? There is something called principles. Right is right and wrong is wrong. . . .
>
> . . . .
>
> So with that in mind, I want to ask when you look over and you look at [defendant], do you think about what the State is trying to do to him, trying to convict him of first degree murder? I want you to consider, I want you to think what [defendant] did to Dorothy Smith. Every time it even arises up in your subconscious what is the State trying to do to this man, you think what he did to Dorothy Mae Smith. She's just forty-four years old. She's a young woman. Every second that has ticked since April 3, 1991 at 10:30, is one second he robbed her of, every second. And from now until some reasonable time when you think she should have died the natural death she deserved, it is another second.
>
> He's still here. He can look out the window and see the weather warming up, hear the birds chirping, and smell the flowers even through the bars of the jail. Dorothy Mae Smith won't smell any more flowers, not in this world anyway. She won't hear any more birds chirping. So if you ever have any feeling of sympathy for this man, you think about what he did to Dorothy Mae Smith.

I guess we can just thank God of all the shots one did finish her off, one killed her, so she didn't have to lay there in her own blood, in her own driveway, waiting to die while these people— and I use the word very loosely—rummaged around in her belongings.

. . . .

[Defendant] showed her no mercy. He showed her family no mercy. Today for his defense—the only thing she has left is her memories. What is she going to be remembered of now? First of all, the lady that was shot down in her back yard. That's who she is. She's not Dorothy Mae Smith, wife of Seymour Smith, mother, anymore. . . . Now she is the lady shot down in her back yard who someone said had cocaine in her house. . . . It's not enough to kill her; you've got to ruin her memories.

Defendant contends the prosecutor improperly argued facts about the victim not supported by the evidence, argued personal opinion, and attempted to evoke sympathy for both the victim and the victim's family.

The jury's determination of guilt or innocence must be based on the evidence presented at trial and not upon any suggested account-ability to the victim or the victim's family. *State v. Laws*, 325 N.C. 81, 381 S.E.2d 609 (1989), *vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, — U.S. —, 116 L. Ed. 2d 174, *reh'd denied*, — U.S. —, 116 L. Ed. 2d 648 (1991). The jury should not focus upon mercy, prejudice, pity or fear, but upon guilt or innocence. *Brown*, 320 N.C. at 196, 358 S.E.2d at 13. The argument here, however, did not so grossly overstep the evidence, or amount to so grossly improper an appeal to the jury's sympathy for the victim or the victim's family, as to require the trial court "to recognize and correct '*ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.' " *Id.* (quoting *Johnson*, 298 N.C. at 369, 259 S.E.2d at 761); *see State v. Covington*, 290 N.C. 313, 328, 226 S.E.2d 629, 640 (1976) (prosecutor's argument that the victim had been " 'a living, breathing human being, just like you and me, and he is gone forever now' was within the bounds of the record evidence"). Moreover, evidence sup-porting a finding of defendant's guilt was overwhelming, and there-fore any impropriety in the remarks was not prejudicial. "In the absence of a showing of prejudice, prosecutorial misconduct in the form of improper jury argument does not require reversal." *State v.*

*Boyd,* 311 N.C. 408, 418, 319 S.E.2d 189, 197 (1984), *cert. denied,* 471 U.S. 1030, 85 L. Ed. 2d 324 (1985).

[11] Finally, within the same assignment of error, defendant excepts to statements by the prosecutor characterizing his case as "an ingenuity of counsel" and a "fairy tale." The prosecutor had prefaced his remarks by quoting *State v. Hammonds* on reasonable doubt:

> A reasonable doubt . . . is an honest, substantial misgiving, generated by the insufficiency of the proof. . . . It is not a doubt suggested by the *ingenuity of counsel,* or by your own ingenuity not legitimately warranted by the testimony, or one born of merciful inclination or disposition to permit the defendant to escape the penalty of the law, or one prompted by sympathy for him or those connected with him.

*State v. Hammonds,* 241 N.C. 226, 232, 85 S.E.2d 133, 138 (1954) (emphasis added). The prosecutor emphasized that the opening statement is not evidence but an outline of what counsel believes the competent and admissible evidence will show. The prosecutor then reminded the jury what defendant stated the evidence would show.

Considering the argument in context, it is apparent that the prosecutor was commenting on defendant's failure to present any of the forecasted evidence rather than unfairly denigrating the defense. *Cf. Covington,* 290 N.C. at 328-29, 226 S.E.2d at 641 (language that "[defense counsel] are supposed to do everything they can to sway your mind from justice in this case and get their clients off if they can" disapproved; argument was not supported by the evidence or the law). "The State . . . may draw the jury's attention to the failure of the defendant to produce exculpatory evidence or evidence to contradict the State's case." *Erlewine,* 328 N.C. at 633, 403 S.E.2d at 284. We hold that the remarks were fair and proper comment on defendant's failure to produce the forecasted exculpatory evidence or evidence to contradict the State's case. None of the arguments were so grossly improper as to require the trial court to intervene *ex mero motu.* This assignment of error is overruled.

SENTENCING PHASE ISSUES

The trial court submitted one aggravating circumstance: that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6) (1988). It submitted one statutory mitigating circumstance: that defendant aided in the apprehension of another capital felon, N.C.G.S. § 15A-2000(f)(8) (1988). It submitted fourteen non-statutory

mitigating circumstances, as follows: the defendant confessed guilt to, and cooperated with, law enforcement officers the day following the crime; after the arrest of the defendant, he freely and voluntarily waived his right to remain silent, have an attorney present at any questioning and have an attorney appointed to represent him during any questioning by law enforcement officials; the plan to commit crimes against the victim was not raised or planned by the defendant; the defendant has a history of addiction to drugs and/or alcohol; the defendant used cocaine on the date of the crime; the defendant has less than average intelligence; the defendant was in special education in school; the defendant lost his father when he was fifteen years old; the defendant has been a person with substantial family ties and continues to have support from family members; the defendant was reared as one of eight children and worked to assist his family; the defendant is a loving father and enjoys a good relationship with his daughter; the defendant has done several things during his life to help his immediate family and collateral relatives; the defendant has financially supported his mother and daughter; and any other circumstance or circumstances arising from the evidence which the jury finds to have mitigating value, N.C.G.S. § 15A-2000(f)(9) (1988).

[12] Defendant contends the trial court erred by sustaining the State's objection to testimony defendant elicited from Dr. Patricio Lara, a forensic psychiatrist at Dorothea Dix Hospital who, pursuant to a special court order, examined defendant for purposes of determining his competency to stand trial. After being properly qualified as an expert in the field of forensic psychiatry, Dr. Lara testified, first, that such evaluations consisted of initial interviews, physical examinations, and other tests needed to clarify diagnosis, including neurological evaluations if there were questions of head injury or brain damage; around-the-clock observation, for a period of, on average, two to three weeks, but not more than sixty days; investigation of the patient's background, previous treatments, medical records, etc.; and an understanding of the pending charges and circumstances of the alleged crime. Dr. Lara testified that the evaluation of defendant included a routine physical examination, routine laboratory tests (urine analysis, blood tests, screening for hepatitis, etc.), and psychological testing that involved assessment of intellectual skills, screening for possible organic brain impairment, a general personality diagnostic assessment with projective drawing test, a Bender gestalt, incomplete sentence blank test, and interviews. Dr. Lara opined, based, *inter alia*, upon interviews with the patient, that there

were findings consistent with drug addiction. "The findings during interview [sic], the type of behavior presented, again, would be consistent with a person who has presented addiction and was, at the time, under no direct access to drugs." Further, Dr. Lara opined that the elevated liver enzyme levels blood tests disclosed were consistent with both alcohol or drug abuse and acute hepatitis. Although "liver enzyme elevation [from] substance abuse is [generally] mild and not of this severity, . . . [he] could not rule out absolutely that this could [not] have been caused by alcohol or substance abuse."

Defendant, however, was not permitted to elicit from Dr. Lara the content of the conversations between Dr. Lara and defendant that may have formed the basis, in part, for this opinion:

[DEFENSE COUNSEL]: Did you determine whether or not he is a drug abuser?

DR. LARA: *He reported to me that he was.*

[PROSECUTOR]: Objection.

COURT: Sustained.

. . . .

[DEFENSE COUNSEL]: *Was he able to remember what happened the night of the crime?*

DR. LARA: No.

[PROSECUTOR]: Objection.

COURT: Sustained.

Defendant contends he was entitled to have the jury know the factual bases for Dr. Lara's opinions, as well as the opinions themselves, even though the opinion is derived in whole or in part through information received from another, including the patient-defendant. We agree.

A physician, as an expert witness, may give his opinion, including a diagnosis, based either on personal knowledge or observation or on information supplied him by others, including the patient, if such information is inherently reliable even though it is not independently admissible into evidence. The opinion, of course, may be based on information gained in both ways. . . . If his opinion is admissible the expert may testify to the information he relied on in forming it for the purpose of showing the basis of the opinion.

*State v. Wade*, 296 N.C. 454, 462, 251 S.E.2d 407, 412 (1979).

The trial court properly admitted Dr. Lara's opinion. Dr. Lara was not a treating psychiatrist but, upon special order of the court, he conducted a thorough and professional examination of defendant. Apparently, "he took into account the entirety of what defendant said together with his own interpretation and analysis of it and the objective manifestations that accompanied it." *Id.* at 463, 251 S.E.2d at 412; *see also State v. Franks*, 300 N.C. 1, 6-9, 265 S.E.2d 177, 180-82 (1980) (a psychiatrist who conducted thorough and professional examination of defendant could properly give an opinion based on personal knowledge, although the psychiatrist was not treating defendant in an effort to cure him, but observed, evaluated and diagnosed defendant to prepare himself to testify at defendant's trial).

Having admitted Dr. Lara's findings and diagnosis, the trial court also should have allowed him to testify as to the content of the conversations with defendant in order to show the basis for his diagnosis. We have stated the reason for allowing such testimony as follows:

> "In the same vein to allow a psychiatrist as an expert witness to answer without any explanation . . . would impart a meaningless conclusion to the jury. The jury must be given an opportunity to evaluate the expert's conclusion by his testimony as to what matters he took into consideration to reach it. Therefore the psychiatrist should be allowed to relate what matters he necessarily considered as a 'case history' not as to indicate the ultimate truth thereof, but as one of the bases for reaching his conclusion, according to accepted medical practice. The court should therefore exercise care in the manner in which such testimony is elicited, so that the jury may understand that the case history does not constitute factual evidence, unless corroborated by other competent evidence."

*Wade*, 296 N.C. at 463-64, 251 S.E.2d at 412 (quoting *State v. Griffin*, 99 Ariz. 43, 49, 406 P.2d 397, 401 (1965)); *see also* N.C.G.S. § 8C-1, Rule 803(4) *Commentary* ("Under current North Carolina practice, statements of past condition made by a patient to a treating physician or psychiatrist, when relevant to diagnosis or treatment and therefore inherently reliable, are admissible to show the basis for the expert's opinion."). Therefore, the trial court erred in refusing to allow Dr. Lara to testify as to the content of his conversations with defendant in order to show the basis for his diagnosis.

Any error, however, was harmless. Substantially the same information came in when Dr. Lara testified about a history of substance abuse:

The fact that he had a supposed *history of substance abuse* would be another way [in addition to the stressful situation of being charged with murder, being incarcerated, and being under a period of observation, and underlying personality difficulties] to explain [defendant's irritability, tenseness, and difficulty coping with the ongoing process of the trial]. A person, after stopping substance abuse, has to face difficulties and cope without the assistance of medication. . . . Frequently, people with substance abuse become quite irritable, and have coping difficulties after they stopped using the drug.

He later testified: "The only opinion we could express, based on the information we had from other sources, was *the history obtained that he had been involved in drug abuse.*" On re-direct examination, Dr. Lara testified that he diagnosed possible cocaine or alcohol addiction *based on defendant's history.* Further, considering defendant's confession to law enforcement officers the day after the shooting, no reasonable juror would have given any weight to defendant's statement to Dr. Lara that he was unable to remember what happened the night of the crime. The error probably redounded to defendant's benefit. This assignment of error is overruled.

[13] Defendant next contends the trial court erred by refusing to submit the statutory mitigating circumstance that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Impaired mental capacity would exist "if the defendant's capacity to appreciate (to fully comprehend or be fully sensible of) the criminality (wrongfulness) of his conduct was impaired (lessened or diminished), or if defendant's capacity to follow the law and refrain from engaging in the illegal conduct was likewise impaired (lessened or diminished)." *State v. Johnson*, 298 N.C. 47, 68, 257 S.E.2d 597, 613 (1979). " 'When evidence is presented in a capital case which may support a statutory mitigating circumstance, the trial court is mandated by the language in 15A-2000(b) to submit that circumstance to the jury for its consideration.' " *State v. Price*, 331 N.C. 620, 632, 418 S.E.2d 169, 175-76 (1992) (quoting *State v. Lloyd*, 321 N.C. 301, 311-12, 364 S.E.2d 316, 323, *vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18, *on remand*, 323 N.C. 622, 374 S.E.2d 277 (1988), *vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 329 N.C. 662, 407 S.E.2d 218 (1991)), *vacated on other grounds*, —— U.S. ——, 122 L. Ed. 2d 113, *on remand*, 334 N.C. 615, 433 S.E.2d 746 (1993), *vacated on other grounds*, —— U.S. ——, 129 L. Ed. 2d 888 (1994). "The test for sufficiency of evidence to support

submission of a statutory mitigating circumstance is whether a jury could reasonably find that the circumstance exists based on the evidence." *Id.* at 632, 418 S.E.2d at 176. Defendant contends there was sufficient evidence of his impaired mental capacity to submit this mitigating circumstance for consideration by the jury. We disagree.

The basis for the submission of this circumstance was the testimony of defendant's sister that defendant had smoked crack on 1 April 1991, some two days before the shooting, and that she found a soda bottle behind a chair in her mother's house which appeared to have a residue of crack on it. She concluded that defendant smoked the crack because she knew her other siblings did not. Larry Perry testified that he saw defendant smoke an unspecified amount of cocaine with Harris in Harris' car around 2:00 p.m. on 3 April 1991, some eight hours before the killing. Perry parted company with them after some five minutes of watching them smoke, and joined them again thirty minutes later. Defendant's sister testified that she saw him later that afternoon at their mother's house. He was playing with her children, eating cookies, and watching television until he left the house at 9:00 p.m., within one-and-one-half hours of the shooting. "He acted normal. . . . He wasn't acting crazy." Defendant returned later that night, picked up some clothes, and got a ride to his girlfriend's house. Defendant's sister also testified that she thought there was one time when he was doing drugs, sometime in 1984, when he was hollering and acting foolish; and again in 1990 when he was walking into pictures. Defendant's mother testified that she never saw defendant take drugs in her house.

Dr. Lara testified for defendant that, based on an interview and the type of behavior presented, there were findings consistent with drug addiction. Elevated liver enzymes were consistent with either drug or alcohol abuse or acute hepatitis, but more likely acute hepatitis because of the severity of the elevation. However, a history of substance abuse might explain defendant's irritability and tenseness; a person, after stopping substance abuse, has to face difficulties and cope without the assistance of drugs or alcohol. Although he was defendant's own expert witness, however, Dr. Lara could not conclude unconditionally that defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired. Rather, he testified:

[T]he available history obtained from the prosecution, and the patient's attorney, and [the patient] himself, included no features

that would suggest impairment to his ability to understand the criminality of the act he's accused of. His condition, particularly if the court finds satisfactory evidence that he was involved not only in the effects of cocaine or alcohol that particular day but also if evidence is presented to the satisfaction of the court that this is an ongoing addiction pattern, the opinion would be that those features would represent restriction to an individual's ability to conform his actions within limits of the law.

Although the evidence tended to show that defendant historically abused drugs, there was no evidence that would support an inference that defendant's mental capacity was impaired at the time of the murder. That defendant smoked an indeterminate amount of crack cocaine over the course of, at most, one-half hour, more than eight hours before he committed the murder, considered in light of the testimony of defendant's sister that he was acting "normal" within one-and-one-half hours of the murder, is not sufficient evidence to show diminished capacity to appreciate the criminality of his conduct or to follow the law and refrain from engaging in the illegal conduct. *Cf. Price*, 331 N.C. at 632, 418 S.E.2d at 176 (testimony by psychologist that "defendant's manic-depression, exacerbated by drugs defendant said he was taking around the time of the murder, 'would indeed have put severe limitations on his ability to make judgments, have appropriate mood responses, conform to the law and basically be properly in touch with reality,' " when considered with other evidence of defendant's past psychiatric problems resulting in hospitalization, held to allow a reasonable inference that defendant's capacity to appreciate the criminality of his conduct was impaired); *State v. McLaughlin*, 330 N.C. 66, 68-70, 408 S.E.2d 732, 733-34 (1991) (evidence of I.Q. of seventy-two, and ingestion of marijuana, wine, beer, and "two hits of acid" on the day of the killing held sufficient; "[t]he jury could have found that a person who had ingested this quantity of drugs and alcohol had his judgment impaired and such impairment had affected his ability to appreciate the criminality of his conduct"); *State v. Allen*, 323 N.C. 208, 230, 372 S.E.2d 855, 868 (1988) (evidence that defendant was a heroin user and had taken a drug three or four hours before the shooting, that defendant had taken drugs the day before the shooting and "felt bad," that defendant experienced withdrawal symptoms, was sick and requested a doctor, and that there were beer cans in the van in which defendant was riding, held insufficient to support submission; "[t]he fact that defendant may have taken a drug several hours before the shooting or that he may have

drunk some beer is not sufficient alone to show diminished capacity"), *vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 331 N.C. 746, 417 S.E.2d 227 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 775, *reh'g denied*, —— U.S. ——, 123 L. Ed. 2d 503 (1993); *State v. Stokes*, 308 N.C. 634, 654-55, 304 S.E.2d 184, 196-97 (1983) (evidence that defendant had been treated at young age for mental problems, that he had an I.Q. of sixty-three, that by age ten he was being treated for unsocialized aggressive behavior and borderline mental retardation, that he had been unsuccessfully treated with medication for these conditions, and that he had antisocial personality disorder, held sufficient to support submission of circumstance); *Johnson*, 298 N.C. at 375, 259 S.E.2d at 764-65 (evidence of long-standing condition of schizophrenia, considered with evidence that suggested an event which triggered condition at time of murder, held sufficient). Therefore, we hold that the trial court properly refused to submit this mitigating circumstance to the jury. This assignment of error is overruled.

**[14]** Within this same assignment of error, defendant also contends the trial court erred in refusing to submit as possible non-statutory mitigating circumstances that (1) defendant's capacity to make and carry out plans on the day of the crime was impaired, and (2) the influence of drugs greatly affected defendant's participation in the crime. We disagree.

> In order for defendant to succeed on this assignment, he must establish that (1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury. Upon such showing by the defendant, the failure by the trial judge to submit such non-statutory mitigating circumstances to the jury for its determination raises federal constitutional issues.

*State v. Benson*, 323 N.C. 318, 325, 372 S.E.2d 517, 521 (1988) (footnote omitted). There is no evidence tending to support either of these proposed mitigating circumstances. As noted above, defendant was seen smoking crack by his sister on 1 April 1991, two days before the killing. He was seen smoking an indeterminate amount of crack in a car with Harris at about 2:00 p.m. on the day of the killing, over eight hours before the event. Later, in the evening of the same day, he was observed playing with his sister's children in a normal manner within an hour-and-a-half of the shooting. He did not suffer from psychosis,

clinical depression, or any other disorders. He had elevated liver enzymes that were consistent with either acute hepatitis or drug abuse, but physicians never ruled out hepatitis. Defendant had an I.Q. of eighty-five, slightly below normal. He was a slow learner while in school, or learning disabled, but not even mildly retarded. Significantly, defendant's own expert witness, Dr. Lara, opined that defendant had the capacity to make and carry out plans on the day of the killing: "I base this on the description of the actions. . . . The person that committed that crime indicated, through the acts committed, that it was a person capable to formulate some planning and some coordinated behavior." Nothing in the evidence would permit the jury to speculate as to the effect of drugs on defendant's participation in the killing. Therefore, we conclude that the trial court did not err by refusing to submit these nonstatutory mitigating circumstances.

[15] By another assignment of error, defendant contends that the trial court erred by refusing to submit the statutory mitigating circumstance that defendant was under the influence of mental or emotional disturbance when the murder was committed, N.C.G.S. § 15A-2000(f)(2) (1988). We disagree.

The asserted basis for the submission of this circumstance was the testimony of Dr. Patricio Lara, the forensic psychiatrist who conducted a pretrial evaluation of defendant to determine his competency to stand trial. Dr. Lara testified for defendant that defendant was of average intelligence; that defendant was not psychotic, although he did demonstrate an episode of agitation where he was suspicious and fearful of being harmed by others upon discharge from Dorothea Dix Hospital; that defendant suffered no organic hallucinations related to organic impairment of the brain; that his irritability and tenseness suggested underlying personality difficulties that made him have particular trouble coping with the murder charges; or, further, given his supposed history of substance abuse, his irritability and tenseness arose from his then lack of access to drugs or alcohol, forcing him to face difficulties and cope without assistance of the previously available drugs or alcohol; or, further still, his irritability and tenseness arose from probable feelings of a hopeless and depressive mood, but defendant was not clinically depressed. Dr. Lara also testified that defendant presented shortcomings in his self-awareness and insight, but his understanding of his surroundings and the reality he was living with was not impaired; and that he was capable of making and carrying out plans the night of the killing, based on the description of his actions that night. Dr. Lara pointedly refused to opine that defend-

ant was under the influence of mental or emotional disturbance the night he committed the murder, stating rather that "as far as I can contribute from a medical viewpoint" defendant was under the influence of some drugs or alcohol. On cross-examination, Dr. Lara testified that defendant was a "person with a short fuse." On redirect examination, he explained that

> [a] person who has underlying personality difficulties and has not reached the level of maturity and seasoning of his character will . . . handle adverse situations poorly, would respond in a rather abrupt way, will not measure the consequence of his emotional response and would tend to have also impulsive conduct.

Defendant also points to evidence that he had a history of drug addiction and that he had smoked some indeterminate amount of crack cocaine eight hours before the murder.

This evidence did not sufficiently show that defendant was under the influence of a mental or emotional disturbance at the time he committed the murders. Without evidence suggesting a link between defendant's mental condition and substance abuse,

> voluntary intoxication by alcohol or narcotic drugs at the time of the commission of a murder is not within the meaning of a mental or emotional disturbance under G.S. 15A-2000(f)(2). Voluntary intoxication, to a degree that it affects defendant's ability to understand and to control his actions . . . is properly considered under the provision for impaired capacity, G.S. 15A-2000(f)(6).

*State v. Irwin*, 304 N.C. 93, 106, 282 S.E.2d 439, 447-48 (1981). Inability to control one's drug habits or temper is neither mental nor emotional disturbance as contemplated by this mitigating circumstance. *Cf. State v. Moose*, 310 N.C. 482, 498-99, 313 S.E.2d 507, 518-19 (1984) (trial court did not err by failing to submit mental or emotional disturbance circumstance where evidence only showed that the defendant's temper controlled his reason, especially when he consumed alcohol, and where circumstance of history of alcohol abuse was submitted and found); *Stokes*, 308 N.C. at 654-55, 304 S.E.2d at 196-97 (evidence that defendant had been treated at young age for mental problems, that he had an I.Q. of sixty-three, that by age ten he was being treated for unsocialized aggressive behavior and borderline mental retardation, that he had been unsuccessfully treated with medication for these conditions, and that he had antisocial personality disorder, held sufficient to support submission of circumstance);

*State v. Pinch*, 306 N.C. 1, 28-29, 292 S.E.2d 203, 224-25, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983) (testimony of psychiatrist that defendant had psychological problems, was a very passive person who exhibited some chronic depression, was mildly depressed due to incarceration and the fact that he was facing two charges of murder, was not basically a violent person, that there was no evidence "that he was an angry acting out type person that you ordinarily find in people that are prone to violence," and no evidence of any thought disorder, held insufficient to show defendant was under the influence of mental or emotional disturbance), *overruled on other grounds by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994) *and by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). We hold, therefore, that the trial court did not err by refusing to submit the mitigating circumstance that defendant was under the influence of mental or emotional disturbance at the time he committed the murder.

Even assuming *arguendo* that the evidence tended to support these four omitted statutory and non-statutory mitigating circumstances, we conclude that any error was harmless beyond a reasonable doubt. The jurors must have considered the evidence when they considered and found the catch-all mitigating circumstance properly submitted pursuant to N.C.G.S. § 15A-2000(f)(9), and when they considered but rejected the five other non-statutory mitigating circumstances dealing with defendant's alleged mental condition and substance abuse: the plan to commit crimes against the victim was not raised or planned by defendant; defendant had a history of addiction to drugs and/or alcohol; defendant used cocaine on the date of the crime; defendant had less than average intelligence; and defendant was in special education in school. It is inconceivable that, having rejected the evidence as to all other mitigating circumstances dealing with defendant's mental conditions and substance abuse, the jury would have accepted this evidence and found that defendant was under the influence of mental or emotional disturbance when he committed the murder. Thus, any such error did not prevent any juror from considering and giving weight to the mitigating evidence, and therefore was harmless beyond a reasonable doubt. *See State v. Green*, 336 N.C. 142, 185-86, 443 S.E.2d 14, 39 (1994).

For these reasons, we reject defendant's arguments and overrule these assignments of error.

**[16]** Defendant next contends the trial court erred by refusing to allow him to present evidence concerning the life sentence received by co-participant Harris and to submit this proposed mitigating circumstance to the jury. Defendant concedes that we have decided this issue adversely to his position in *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), where we stated:

> The fact that the defendant's accomplices received a lesser sentence is not an extenuating circumstance. It does not reduce the moral culpability of the killing nor make it less deserving of the penalty of death than other first-degree murders. *See State v. Hutchins*, 303 N.C. 321, 279 S.E.2d 788 [(1981)]. The accomplices' punishment is not an aspect of the defendant's character or record nor a mitigating circumstance of the particular offense. *See Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L. Ed. 2d 973 (1978). It bears no relevance to these factors, and thus there was no error in the judge's refusal to submit it to the jury.

*Id.* at 687, 292 S.E.2d at 261-62. "Further, G.S. 15A-2000(d) provides for review by this [C]ourt to ensure that a death sentence, when imposed, is not excessive or disproportionate to the penalty imposed *in similar cases." Irwin*, 304 N.C. at 104, 282 S.E.2d at 447 (emphasis added) (evidence of plea bargain and sentencing agreement between the State and a co-defendant was irrelevant and properly excluded from the jury's consideration as a mitigating circumstance, because such evidence had no bearing on defendant's character, record, or the nature of his participation in the offense).

Defendant requests that we reconsider that holding in light of the decision in *Parker v. Dugger*, 498 U.S. 308, 112 L. Ed. 2d 812, *reh'g denied*, 499 U.S. 932, 113 L. Ed. 2d 271 (1991). In that case, the United States Supreme Court held that, after striking two aggravating circumstances, the Florida Supreme Court acted arbitrarily by affirming the defendant's death sentence without considering the mitigating circumstances found by the trial judge, one of which was more lenient sentencing for the perpetrator of the crime. *Id.* at 322, 112 L. Ed. 2d at 827. Defendant contends the Supreme Court thus impliedly held that the sentence received by a co-defendant is relevant evidence in mitigation as a matter of federal law, and therefore that the evidence should have been admitted in his case. We disagree.

Under Florida law evidence of more lenient sentencing for the perpetrator may be submitted and considered in mitigation. *Id.* at

315, 112 L. Ed. 2d at 822 (citing *Malloy v. State*, 382 So. 2d 1190, 1193 (1979)). The Supreme Court simply recognized this to be the law in Florida and concluded that "[t]he trial judge must have at least taken this evidence into account before passing sentence." *Id.* It did not address the underlying rationale of *Williams* or otherwise suggest that exclusion of such evidence was improper as a matter of federal law.

We continue to adhere to our decision in *Williams*. This assignment of error is overruled.

[17] Defendant next contends the trial court erred by allowing the prosecutor to elicit testimony concerning defendant's failure to testify at the trial of his co-participant and to comment upon that testimony during closing arguments. Evidence presented during the guilt-innocence phase showed that defendant confessed to the crimes on 4 April 1991 and rendered assistance to law enforcement officers with regard to locating the money stolen, the weapons used, and the co-participant, Harris. During cross-examination of courtroom clerk Susan Clark, whom defendant called to testify that Harris was a capital felon for the purpose of establishing existence of the statutory mitigating circumstance that defendant aided in the apprehension of a capital felon, N.C.G.S. § 15A-2000(f)(8), the following exchange occurred:

[PROSECUTOR]: In the course of the trial of Wesley Thomas Harris, is it not true that this defendant, David Ward, was called as a witness and refused to testify?

[DEFENSE COUNSEL]: Objection.

COURT: Overruled.

MS. CLARK: Yes, sir.

[DEFENSE COUNSEL]: We move to strike her answer.

COURT: Motion denied.

The prosecutor commented upon the testimony during closing argument as follows:

There is something else. There is one other little piece . . . to this puzzle. You remember Suzie Clark. The lady who was the Clerk of Court, Deputy Clerk, Assistant Clerk, came up there and testified for the defendant under his mitigating circumstances. And on cross-examination I asked her, well, now isn't it true that

the defendant in this case was called as a witness in the trial of the co-defendant? Yes. And isn't it true that he refused to testify? Yes.

I mean, folks, let's put things into perspective. You know what they say, proof is in the pudding, talk is cheap. April 4th, sure, yeah, you've got me. This is what I did. That's the other guy. That's where the guns are. Come to court, call you around as a witness, refuse to testify. What weight? What real weight do you put on his cooperation? Wouldn't you love to—sure, he got up there on the stand, pointed the other defendant out, was instrumental in the conviction of the co-defendant. No, no, you didn't hear that. Refused to testify.

Defendant contends the prosecutor thus improperly elicited, and during closing arguments commented upon, the testimony about defendant's exercise of his Fifth Amendment privilege against self-incrimination, which encompasses the prohibition upon comment by the State regarding defendant's failure to take the stand. *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106, *reh'g denied*, 381 U.S. 957, 14 L. Ed. 2d 730 (1965).

Assuming *arguendo* that this was constitutional error under *Griffin*, the State has carried its burden of showing that any error in eliciting or commenting upon the testimony was harmless beyond a reasonable doubt. The prosecutor vigorously argued during closing arguments that the fact that defendant was called as a witness but refused to testify in Harris' trial was significant because it obviated the mitigating value of the evidence that defendant rendered assistance to law enforcement officers to effect the apprehension of Harris. The jury, however, rejected this argument and found both the statutory mitigating circumstance dealing with defendant's assistance rendered—that defendant aided in the apprehension of a capital felon—and the other, more specific nonstatutory mitigating circumstance submitted in this regard—that defendant confessed guilt to, and cooperated with, law enforcement officials the day following the crimes. For this reason, we conclude that any error was harmless beyond a reasonable doubt. This assignment of error is overruled.

[18] In his next assignment of error, defendant basically contends the trial court erred by instructing the jury that it could exclude mitigating evidence from its consideration if it deemed the evidence to have no mitigating value. The trial court instructed as follows:

You should also consider the following circumstances arising from the evidence which you find to have mitigating value. If one or more of you find by a preponderance of the evidence that any of the following circumstances exist and also are deemed by you to have mitigating value, you would so indicate by having your foreperson write "yes" in the space provided.

If none of you find the circumstance to exist or if none of you deem it to have mitigating value, you would so indicate by having your foreperson write "no" in that space.

These instructions were given for all of the nonstatutory mitigating circumstances submitted. Defendant contends the trial court unconstitutionally permitted the jury to exclude relevant mitigating evidence from its consideration.

We have decided this issue adversely to defendant's position in *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), where we stated:

The language of the instructions clearly permits and instructs the jury to consider any evidence of the nonstatutory mitigating circumstances, as required by *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, and *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1 (1982). As this Court noted in *State v. Fullwood*, however, "neither *Lockett* nor *Eddings* requires that the sentencer must determine that the submitted mitigating circumstance has mitigating value." *Fullwood*, 323 N.C. at 396, 373 S.E.2d at 533.

*Id.* at 117, 443 S.E.2d at 325. We find no compelling reason to depart from our prior holding. This assignment of error is overruled.

**[19]** Defendant next contends the trial court erred by failing to recognize and correct *ex mero motu* the prosecutor's grossly prejudicial closing arguments at sentencing.

"[C]ounsel will be allowed wide latitude in the argument of hotly contested cases. [Citation omitted.] Counsel for each side may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his or her side of the case. [Citation omitted.] Decisions as to whether an advocate has abused this privilege must be left largely to the sound discretion of the trial court."

*Brown*, 320 N.C. at 194, 358 S.E.2d at 12-13 (quoting *Huffstetler*, 312 N.C. at 112, 322 S.E.2d at 123). Although defendant raised no objection at trial,

STATE v. WARD

[338 N.C. 64 (1994)]

"[i]n capital cases . . . an appellate court may review the prosecution's argument, . . . but the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it."

*Id.* at 194-95, 358 S.E.2d at 13 (quoting *Johnson*, 298 N.C. at 369, 259 S.E.2d at 761).

Defendant takes exception to the prosecutor's argument that, he contends, was clearly intended to evoke sympathy for the victim and her family, as illustrated by the following:

This was a living breathing woman, you know, who I suggest to you had the same desires to live that each of you have, you know, that April of last year; certainly looked forward to the spring, flowers, warm weather, and living a productive life.

Folks, she didn't deserve to die like that. . . . You know, maybe in an automobile accident, cancer, heart disease, but I mean, to be gunned down in her own back yard, no warning, no chance. As I say, shot down like a dog. And for what reason? . . . Money, greed. That's the value that this defendant placed on the life of Dorothy Mae Smith. I suggest to you in deciding what the appropriate punishment to recommend for this defendant, for you speak as the conscience of Pitt County.

What benefits did society enjoy because Dorothy Mae Smith was alive for forty-four years? Her husband, or son? . . . What has society lost because she was killed and taken from us . . . ?

. . . .

. . . I don't care how close you are to someone, time passes; and if that person is not still there to generate events that cause memories, then memories fade. . . . That's what David Ward took from these people.

The argument, if improper, was not so grossly so as to require the trial court to intervene *ex mero motu.*

[20] Defendant also takes exception to the argument:

This is a man with a short fuse. I suggest to you this is a man that can kill again. . . .

. . . .

I don't know that executing David Ward will ever make anyone think twice about committing murder. It may or may not deter a murder. That's not the issue here today. But it would doggone sure deter David Ward. I can guarantee you that he will never commit another murder. Now are you willing to say he won't if you give him life?

Defendant contends the prosecutor appealed to the jury to recommend the death penalty as a deterrent to his killing again, thus improperly appealing to the jurors' passions, prejudices and fears. We disagree. We have held such specific deterrence arguments proper. *Syriani*, 333 N.C. at 397, 428 S.E.2d at 144 (specific deterrence argument, "He's killed now. The only way to insure he won't kill again is the death penalty," not improper); *State v. Zuniga*, 320 N.C. 233, 268-69, 357 S.E.2d 898, 920-21 (1987) (specific deterrence argument, "Justice is making sure that [defendant] is not ever going to do this again," not improper), *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987), *denial of post-conviction relief reversed*, 336 N.C. 508, 444 S.E.2d 443 (1994). The argument in this case likewise was not improper. This assignment of error is overruled.

**[21]** Defendant next contends the trial court erred by admitting testimony about his prior convictions. Defendant offered evidence that he had been a good son, sibling, and father. He had worked to earn money for the family since the age of eight; he had always helped his brother, his blind grandmother, and his uncle; he had a good relationship with his daughter; and he had supported his family financially. The State cross-examined his mother about his prior convictions, specifically, about his breaking into a local restaurant and his stealing of guns, microphones, jewelry, liquor, and other property; breaking into a local car dealership and stealing an automobile; breaking into a local restaurant and stealing gloves, keys and other items; forging checks on a local lumber company's account; and stabbing his sister's boyfriend. Defendant contends the State may only rebut his evidence with specific character evidence that he was not a loving and responsible son, sibling, or father. We disagree.

Our capital sentencing statute not only permits but requires juries to determine the sentence guided "by a carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused." *State v. Johnson*, 298 N.C. at 63, 257 S.E.2d at 610. This statute, however, limits the state in its case in chief to proving only those aggravat-

ing circumstances listed in section (e). Bad reputation or bad character is not listed as an aggravating circumstance. Therefore the state may not in its case in chief offer evidence of defendant's bad character. A defendant, however, may offer evidence of whatever circumstances may reasonably be deemed to have mitigating value, whether or not they are listed in section (f) of the statute. *State v. Johnson*, 298 N.C. at 72-74, 257 S.E.2d at 616-17. Often this may be evidence of his good character. The state should be able to, and we hold it may, offer evidence tending to rebut the truth of any mitigating circumstance upon which defendant relies and which is supported by the evidence, including defendant's good character.

*State v. Silhan*, 302 N.C. 223, 273, 275 S.E.2d 450, 484 (1981) (footnote omitted). As in *Silhan*, defendant proffered evidence of his good character "tending to show [him] to be, generally, a good person by those most intimately acquainted with him." *Id.* The State was entitled to rebut this good character evidence with evidence of specific instances of other crimes, wrongs or acts by the defendant. "Both the state and defendant are entitled to a fair sentencing hearing, and the jury is entitled to have as full a picture of a defendant's character as our capital sentencing statute and constitutional limitation will permit." *Id.*

In the alternative, defendant contends that only the record evidence of prior crimes, and not the circumstances of those crimes, should have been admitted. We disagree. "Consistent with prior decisions of this Court, the State is entitled to present witnesses in the penalty phase of the trial to prove the circumstances of prior convictions and is not limited to the introduction of evidence of the record or conviction." *Roper*, 328 N.C. at 365, 402 S.E.2d at 616. "[E]vidence of the circumstances of prior crimes is admissible to aid the sentencer." *Id.* at 364, 402 S.E.2d at 615-16. This assignment of error is overruled.

[22] By his final assignment of error, defendant contends the trial court erred by denying his motion for a mistrial after his profane outburst during the State's cross-examination of his mother about his prior convictions. Defendant stood, and the following exchange occurred:

DEFENDANT: This is my mother f———— life you are talking about.

STATE v. WARD

[338 N.C. 64 (1994)]

COURT: Mr. Evans and Mr. Duke, you need to caution your client about any further outburst in this courtroom. They will not be tolerated, sir.

[DEFENSE COUNSEL]: Yes, sir, we will. In fact, excuse me.

COURT: Ladies and gentlemen of the jury, you may be excused for one second if you will.

(All members of the jury retired to the juryroom . . . .)

COURT: Mr. Ward, these proceedings are going to continue, sir, with or without your presence in here. I want you to understand that.

DEFENDANT: Well, if you want to know my whole record, why don't you tell me what it is? Why not put me on the witness stand and let me tell it?

COURT: These are not questions, sir. This is a statement to you. Now either you are going to sit here and be quiet or I'll have you removed.

DEFENDANT: Why don't you ask me, mother f———? If he wants to know about my mother f——— record, let him put me on the stand and I'll tell him about it. Why don't you let me, mother f——?

Defendant was removed from the courtroom, and the court recessed for fifteen minutes. Defendant was brought back to the courtroom handcuffed and shackled for security purposes. The jury had not yet returned. The trial court ordered that, for the duration of the proceedings, defendant be brought in prior to the jury and remain seated until after the jury had been discharged, so that the jury would not see the handcuffs and shackles.

Counsel for defendant then made a motion for mistrial on the ground that the questions asked of Mrs. Ward about defendant's prior convictions were improper. The trial court denied the motion. Defendant contends the outburst instilled fear of him in the jury, and draws our attention to the prosecutor's argument, "This is a man with a short fuse. I suggest to you this is a man that can kill again."

Whether a motion for mistrial should be granted is a matter which rests in the sound discretion of the trial court. A mistrial should be granted only when there are improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair and impartial verdict. Ordinarily, denial of a motion

for mistrial will not be disturbed on appeal absent a showing of abuse of the trial court's discretion.

*Laws*, 325 N.C. at 105, 381 S.E.2d at 623 (citations omitted). We conclude that the trial court did not abuse its discretion by denying defendant's motion for mistrial. As we concluded above, the questions asked of Mrs. Ward about defendant's prior convictions were proper to rebut defendant's good character evidence offered in mitigation. If defendant was prejudiced, it was because of his own misconduct at trial, and he cannot now be heard to complain. Further, after defendant's outburst, the court acted promptly and decisively to restore order by excusing the jury and allowing a short recess to dispel emotions. *Cf. State v. Bonney*, 329 N.C. 61, 75-76, 405 S.E.2d 145, 153 (1991) (trial court did not abuse its discretion by denying motions for mistrial on grounds of improper questions which provoked defendant, and subsequent outburst by defendant, even though trial court deemed questions improper). This assignment of error is overruled.

PRESERVATION ISSUES

Defendant raises five additional issues which he concedes this Court has decided against his position: (1) the trial court erred by limiting defendant's access to pretrial discovery, thereby violating his due process rights; (2) the North Carolina death penalty statute is unconstitutional, is applied in a discriminatory manner, and allows unconstitutionally impermissible discretion; (3) the short-form indictment under N.C.G.S. § 15-144 violates the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, §§ 19, 22, and 23 of the North Carolina Constitution, and N.C.G.S. § 15A-924(a)(5); (4) the trial court erred by denying defendant's motion for the State to disclose those aggravating circumstances upon which it would rely during the capital sentencing proceeding; and (5) the process of "death qualifying" the jury violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, § 19 of the North Carolina Constitution.

We have considered defendant's arguments on these issues, and we find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

PROPORTIONALITY REVIEW

[23] Having found no error in the guilt and sentencing phases, we are required by statute to review the record and determine (1) whether

**STATE v. WARD**

[338 N.C. 64 (1994)]

the record supports the jury's finding of the aggravating circumstance upon which the sentencing court based its sentence of death, (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. Robbins*, 319 N.C. 465, 526, 356 S.E.2d 279, 315, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

We conclude that the record supports the jury's finding of the aggravating circumstance submitted to it: that the murder was committed for pecuniary gain. N.C.G.S. § 15A-2000(e)(6) (1988). We further conclude that nothing in the record suggests that the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review and determine "whether the [death] sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Brown*, 315 N.C. 40, 70, 337 S.E.2d 808, 829 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). It is our purpose in proportionality review "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury," *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988), and to serve as "a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).

> [W]e use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Bacon*, 337 N.C. 66, 104, 446 S.E.2d 542, 562 (1994) (quoting *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983)). We consider only those cases "which are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632,

648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

> If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence is excessive or disproportionate.

*Id.*

This case involves a particularly cold, calculated, unprovoked and passionless killing committed to obtain the meager proceeds from the small convenience store the victim owned. Defendant determined some time prior to the killing that he was going to rob and perhaps kill Dorothy Mae Smith, spent the day of the killing riding around with his co-participant, and when night came, armed himself with a semi-automatic rifle equipped with a telescope for better sighting and hid in the bush outside the backdoor of the victim's house. When Dorothy Mae Smith got out of her truck, defendant did not demand her possessions, but simply started shooting. Dorothy Mae Smith suffered at least three non-fatal wounds before she was rendered unconscious by a fatal wound to the head, severing the brain stem, from a shot fired from the semi-automatic rifle. Harris picked up the plastic bag containing the money box and ran with defendant to their waiting car, discarding the few personal items belonging to the victim along the driveway.

The jury returned a verdict finding defendant guilty of first-degree murder upon the theories of lying in wait, premeditation and deliberation, and felony murder. It found the only aggravating circumstance submitted—that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6)—and only three mitigating circumstances—that defendant aided in the apprehension of another capital felon, that defendant confessed guilt to, and cooperated with, law enforcement officers the day following the crime, and that it was never proven as to which firearm defendant fired on 3 April 1991. It refused, however, to find, *inter alia*, that the plot to commit crimes against the victim was not raised or planned by defendant; that after the arrest of defendant, he freely and voluntarily waived his rights to remain silent, have an attorney present at any questioning and have

an attorney appointed to represent him during any questioning by law enforcement officials; that he has a history of addiction to drugs and/or alcohol; that he used cocaine on the date of the crime; that he has less than average intelligence; and that he was in special education in school.

Defendant contends that this case more closely resembles those in which this Court has found the death sentence disproportionate than those involving remorseless, torturous killings in which this Court has allowed death sentences to stand. As in his case, three were robbery-murders and involved the "pecuniary gain" aggravating circumstance: *Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). Two involved the especially "heinous, atrocious, or cruel" aggravating circumstance: *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983). None are sufficiently similar to the present case to merit a finding of disproportionality here.

In *Benson* the defendant confronted the victim and demanded his money. When the victim hesitated, the defendant fired his gun, striking the victim in the upper portion of both legs. The victim died later in the hospital of cardiac arrest resulting from loss of blood. *Benson*, 323 N.C. at 321, 372 S.E.2d at 518. This Court found the death sentence disproportionate because, in contrast to the present case, the defendant was convicted solely on the theory of felony murder, and the evidence that he fired at the victim's legs tended to show that the defendant intended only to rob the victim. Further, also in contrast to the present case, the jury found as mitigating circumstances that the defendant was under the influence of mental or emotional disturbance and had no significant history of prior criminal activity. *Id.* at 328, 372 S.E.2d at 522. Further still, the defendant not only confessed and cooperated upon arrest, as in the present case, but he pled guilty during the trial and acknowledged his wrongdoing before the jury. *Id.* at 328, 372 S.E.2d at 523.

In *Young* the defendant, who had been drinking heavily all day, suggested to two co-participants that they rob and kill the victim so they could buy more liquor. *Young*, 312 N.C. at 672, 325 S.E.2d at 184. The three began walking to the victim's house and gained entry. Then they stabbed the victim and left the house with money, a coin collection, and other valuables which they divided. *Id.* at 673, 325 S.E.2d at 184. The murder was not as coldly planned and executed as that in

STATE v. WARD

[338 N.C. 64 (1994)]

the present case, and defendant in the present case was not heavily intoxicated by drugs or alcohol, as was the defendant there.

In *Jackson* the defendant, who had been drinking, recognized the victim on the road, told his companions that the victim might have some money on his person, got out his gun, and ordered his companions to follow the victim's car. Finding the car, the defendant and his companions faked a breakdown, waved the victim down, and asked the victim for jumper cables. The victim was found shot twice in the head at close range with his wallet gone and some change scattered on the ground near his car. *Jackson*, 309 N.C. at 29-30, 305 S.E.2d at 707-08. This murder, like that in *Young*, had an element of relative spontaneity that is absent here. It was not as coldly planned and executed as that in the present case.

In *Bondurant* the defendant pointed the gun at the victim, taunted him for at least two minutes, and then shot him. *Bondurant*, 309 N.C. at 677, 309 S.E.2d at 173. "[I]mmediately after he shot the victim, he exhibited a concern for [the victim's] life and remorse for his action by directing the driver of the automobile to the hospital." *Id.* at 694, 309 S.E.2d at 182. Defendant entered the hospital to secure medical assistance for his victim and spoke there with police, confessing that he had shot the victim. *Id.* Here, by contrast, defendant (or his co-participant) grabbed the money and ran, returned to his mother's house, picked up some clothes, and took a cab to his girlfriend's house. Only when arrested the next day on an outstanding warrant for unrelated charges did defendant confess to the killing, and he never expressed remorse for his actions.

In *Stokes* the defendant and two companions planned to rob the victim's business. During the robbery the assailants severely beat and killed the victim. *Stokes*, 319 N.C. at 3, 352 S.E.2d at 654. In contrast to the present case, there was evidence there "that [the defendant] suffered from impaired capacity to appreciate the criminality of his conduct, and that he was under the influence of a mental or emotional disturbance at the time of the murder." *Id.* at 21, 352 S.E.2d at 664. The Court also considered it important that the defendant was only seventeen; defendant here is twenty-nine.

*Stokes* involved a robbery-murder, as here, but the defendant was convicted only on the theory of felony murder; there was "little, if any," evidence of premeditation and deliberation. *Id.* at 24, 352 S.E.2d at 666. Here, defendant was convicted upon the theories of premeditation and deliberation, and lying in wait, and there was substantial

evidence of premeditation and deliberation. The Court also found no evidence in *Stokes* showing that defendant deserved a death sentence any more than did his co-participant who received a life sentence. *Id.* at 21, 352 S.E.2d at 663.

Defendant contends that one other case in which the jury recommended a life sentence is most similar to the present case, that of his co-participant, Wesley Thomas Harris. *See State v. Harris,* 338 N.C. 211, 449 S.E.2d 462 (1994). Defendant contends it was Harris who raised the idea of robbing, and possibly killing, Dorothy Mae Smith; drove him to Smith's home; retrieved the money box; drove him from the crime scene; stored the firearms at his apartment; and was found in possession of the stolen money. Defendant contends that, under the authority of *Stokes,* 319 N.C. 1, 352 S.E.2d 653, his death sentence was excessive; as to the crime committed, his co-participant was more culpable or at most they were equally culpable because "[b]oth committed the same crime in the same manner." *Id.* at 21, 352 S.E.2d at 663.

Pursuant to N.C.G.S. § 8C-201 (1992) (Judicial Notice), we take judicial notice of the record in that case—*see Swain v. Creasman,* 260 N.C. 163, 164, 132 S.E.2d 304, 305 (1963)—as well as the opinion, to address defendant's contentions and distinguish that case from this one. The *Harris* jury found Harris guilty of first-degree murder only on the theories of lying in wait and felony murder; it did not find him guilty on the theory of premeditation and deliberation. *See Harris,* 338 N.C. at 216, 224, 449 S.E.2d at 464, 468. Here, by contrast, the jury found defendant guilty on the theory of premeditation and deliberation. Harris had presented expert evidence at the guilt-innocence phase that he could not form the specific intent to kill because of his chronic and acute alcohol, cocaine and marijuana dependencies. *See id.* at 219, 449 S.E.2d at 465-66. Further, while the *Harris* jury found that the murder was committed for pecuniary gain, it also found mitigating circumstances dealing with Harris' substance abuse and mental condition: that the murder was committed while the defendant was under the influence of mental or emotional disturbance, that the defendant acted under the domination of another person, that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, that Harris' personality disorders and/or drug addiction and/or emotional problems are subject to successful treatment on a long-term basis, and that Harris has adjusted well to incarceration and has been a good inmate. Here, by contrast, there

was insufficient evidence to support either the mitigating circumstance that the murder was committed while defendant was under the influence of mental or emotional disturbance, or that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Further, the jury here refused to find any of the nonstatutory mitigating circumstances dealing with defendant's alleged drug addiction or mental condition. These facts significantly distinguish the character of the co-participants and the nature of their involvement in the offense, thus justifying their disparate sentences.

The most singular feature of this case is that it is a murder perpetrated by lying in wait. One other case in the pool is most similar to this one for purposes of proportionality review—*State v. Brown*, 320 N.C. 179, 358 S.E.2d 1. The Court in *Brown* emphasized that the crime of first-degree murder by lying in wait at the victim's residence "shocks the conscience, not only because a life was senselessly taken, but because it was taken by the surreptitious invasion of an especially private place, one in which a person has a right to feel secure." *Id.* at 231, 358 S.E.2d at 34. "The victim, unaware of the threat, had no opportunity to defend [her]self. Unlike the victim felled in a face-to-face confrontation, this victim had no chance to fight for [her] life." *Id.* at 232, 358 S.E.2d at 34 (citation omitted).

In *Brown* "[t]he murder was committed after defendant had lain in wait under the victim's window and paused for the victim to position himself in the most opportune place for annihilation." *Id.* at 231-32, 358 S.E.2d at 34. As in the present case, "[t]he crime was as calculated and deliberate as a murder can be. In the lengthy, purposeful plotting, and in the execution of [the] crime, the defendant displayed a cold callousness and obliviousness to the value of human life." *Id.* at 232, 358 S.E.2d at 34. As in the present case, "defendant displayed absolutely no remorse or contrition for his act." *Id.* In addition, there was evidence in the record in *Brown* that the victim had mistreated the defendant and that the defendant had been drinking, but the jury refused to find the corresponding mitigating circumstances. *Id.* at 232, 358 S.E.2d at 35. Here, the jury likewise refused to find any of the mitigating circumstances dealing with defendant's alleged drug abuse and drug intoxication on the night of the murder.

The jury here did find it mitigating that the defendant had aided in the apprehension of his co-participant, confessed guilt to and cooperated with law enforcement officers the day following the crime, and

that it was never proven as to which firearm the defendant fired. Nevertheless, as in *Brown*, "[v]iewed in light of the evidence regarding the nature of the crime and the character of the defendant, we find the evidence diminishing culpability minuscule and insufficient to warrant a holding of disproportionality." *Id.*

We conclude that the circumstances of the numerous cases cited by defendant in which the jury returned a life sentence, or in which this Court held a death sentence disproportionate, distinguish those cases from the present case; *Brown* is the case in the pool most comparable to the present case. In light of *Brown*, and of the especially cold, calculated, and unprovoked nature of the offense here, we cannot say that the death sentence was excessive or disproportionate, considering both the nature of the crime—a premeditated and deliberated, lying in wait killing—and the character of the defendant.

We hold that defendant received a fair trial and sentencing proceeding, free of prejudicial error. In comparing this case to similar cases in which the death penalty was imposed, and in considering both the crime and the defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive.

NO ERROR.